Filed 10/1/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040412 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F16423) |
| v. | |
| ANTHONY ACHILLES POLETTI, | |
| Defendant and Appellant. | |

Defendant Anthony Achilles Poletti was accused by his step-daughter (victim) of subjecting her to a variety of acts of sexual molestation when she was between the ages of 10 and 15 years old. Those acts included rape, forced oral copulation, and other forms of child sexual abuse.

In 2009, a jury convicted defendant of fifteen felonies, including rape, forcible lewd acts upon a child, aggravated sexual assault upon a child by oral copulation, aggravated sexual assault upon a child by sexual penetration, dissuading a witness from reporting a crime, and possession of child pornography. The jury acquitted defendant, however, of raping victim during the winter break of her freshman year of high school (Winter Break rape).

On appeal following defendant's initial trial, this court reversed. We directed the trial court on remand to enter a verdict of acquittal of a rape alleged to have taken place in June 2007, citing a lack of substantial evidence supporting the charge. We ordered a retrial on the remaining sexual abuse charges on juror misconduct grounds. Because the convictions for dissuading a witness from reporting a crime and possession of child pornography were unaffected by any error, we directed the court to enter verdicts of

conviction on those counts.

At defendant's second trial, although the alleged Winter Break and June 2007 rapes were not charged, evidence of them was admitted both to attack and bolster victim's credibility. The jury found defendant guilty of two counts of forcible lewd touching of a child under age 14 and hung on nine other charges of child sexual abuse. The trial court sentenced defendant to 18 years eight months in prison.

On appeal, defendant contends the trial court erred by admitting evidence of the uncharged Winter Break and June 2007 rapes without informing the jury of his prior acquittals. Defendant also raises several claims of prosecutorial misconduct and asserts cumulative error. Though we affirm the judgment, we find that several instances of prosecutorial misconduct took place and we are reporting the prosecuting attorney's conduct to the State Bar of California.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Defendant is Charged*

The Santa Cruz County District Attorney filed a 17-count information against defendant in August 2008. It charged defendant with five counts of forcible lewd acts upon a child under age 14 (Pen. Code, § 288, subd. (b)(1), counts 1, 3, 5, 8, 10);[1] aggravated sexual assault upon a child under age 14 by rape (§ 269, subd. (a)(1), count 2); aggravated sexual assault upon a child under age 14 by oral copulation (§ 269, subd. (a)(4), count 4); forcible oral copulation (§ 288a, subd. (c)(2), count 6); two counts of aggravated sexual assault upon a child under age 14 by sexual penetration (§ 269, subd. (a)(5), counts 7 & 9); three counts of forcible rape (§ 261, subd. (a)(2), counts 11, 13, 15); two counts of forcible lewd acts upon a child aged 14 or 15 (§ 288, subd. (c)(1), counts 12 & 14); dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1), count 16); and possession of child pornography (§ 311.11, subd. (a), count 17).

---

[1] Unspecified statutory references are to the Penal Code.

2

The alleged victim of the charged sexual abuse was defendant's step-daughter.

**B.    *The First Trial and Appeal***

Defendant was tried and convicted of all but two of the charged offenses.  He was acquitted of one count of forcible rape (count 11) and one count of lewd acts upon a child aged 14 or 15 (count 12).  Both of those charges related to the alleged Winter Break rape.  The trial court sentenced defendant to 68 years eight months in prison.

On appeal, this court reversed.  In a nonpublished opinion, we concluded juror misconduct had occurred that required reversal of 12 counts of various forms of child molestation.  We also concluded that no substantial evidence supported the conviction on count 13 for forcible rape in June, 2007.  In reaching the latter conclusion, we noted that the basis for that count was an incident that victim testified occurred in June 2007, just after she had turned 15 years old.  (*People v. Poletti* (Dec. 19, 2012, H035544) [nonpub. opn.] [2012 Cal.App. Unpub. LEXIS 9266] (*Poletti*).)  On direct examination, victim had testified that defendant came into her bedroom, pulled her into her bathroom, pushed her against the counter, took her pants down, "and took his penis and rubbed it in [her] butt. And after that [she] remember[ed] him sticking it inside [her] vagina." (*Id*. [at p. 8].)  On cross-examination, however, victim had denied being raped during the June 2007 incident and explained that her direct testimony referred to a rape that occurred over her freshman year Winter Break.  (*Id*. [at p. 7].)  The alleged Winter Break rape was the basis for counts 11 and 12, of which defendant was acquitted.  (*Id*. [at p. 8].)  Victim testified that incident occurred "sometime during winter break" after the New Year when she was a freshman in high school.  (*Id*. [at p. 7].)  On cross-examination, victim confirmed that the incident occurred shortly after January 1, 2007, during a two-week break that had begun just before Christmas.  (*Id*. [at p. 8].)  Even when confronted with hospital records showing defendant was hospitalized between December 26, 2006 and January 16, 2007, she insisted the incident took place in the first few days of 2007.  (*Ibid*.)

3

In view of victim's contradictory accounts of the June 2007 incident, this court concluded that the evidence supporting defendant's conviction on that count was not "sufficient to overcome the presumption of innocence and to meet the burden resting upon the prosecution to establish guilt beyond a reasonable doubt.' " (*Poletti*, *supra*, H035544 [at p. 82].)

The convictions on counts 16 and 17 for dissuading a witness and possession of child pornography were not impacted by the errors. Accordingly, we directed the trial court on remand to enter a verdict of acquittal on count 13, enter verdicts of conviction on counts 16 and 17, and retry the assaultive counts. (*Poletti*, *supra*, H035544 [at pp. 95-96].)

## C. *The Second Trial*

Defendant was retried in August and September 2013. He was retried on five counts of forcible lewd acts upon a child under age 14 (§ 288, subd. (b)(1), counts 1, 3, 5, 8, 10); four counts of aggravated sexual assault upon a child under age 14 (§ 269, subd. (a), counts 2, 4, 7, 9); forcible oral copulation (§ 288a, subd. (c)(2), count 6); forcible rape (§ 261, subd. (a)(2), count 12 (former count 15)); and forcible lewd acts upon a child aged 14 or 15 (§ 288, subd. (c)(1), count 11 (former count 14)).

### 1. *Defense Motion to Admit Evidence of Victim's Testimony at the First Trial Regarding the Alleged Winter Break Rape and June 2007 Rape*

Before the second trial, defendant moved to admit evidence regarding the alleged Winter Break and June 2007 rapes to undermine victim's credibility. The prosecutor objected only to the admission of evidence that defendant was acquitted of those rapes, in part because defendant was being retried on former count 14, which charged the June 2007 incident as forcible lewd acts, rather than as rape. With respect to the admission of evidence of the two uncharged rapes, the prosecutor stated that victim "frankly will be testifying on direct about all of these incidents. And so I--you know, . . . he's not charged

4

with anything from around Christmas time [i.e., the alleged Winter Break rape].  There's going to be some testimony about that. [¶] With respect to the [June 2007] event, he is charged with that event and there's going to be testimony about that."  The court granted defendant's motion and prohibited the parties from mentioning the first trial or any convictions or acquittals.

2.      *Victim*

Victim, who was 21 years old at the time of the second trial, testified that defendant, her step-father, began molesting her when she was 10 or 11 years old.  The molestation was "random" in that a lot of time would pass between incidents.  Victim testified about nine specific incidents that occurred in the home she shared with her mother, step-father, and two half-brothers.

The first molestation, when victim was 10 or 11 years old, occurred in the downstairs bathroom.  Defendant pulled down victim's pants and rubbed his penis up and down her butt crack.  Victim did not remember how the incident ended.  On cross-examination, she acknowledged that she told an investigator in 2008 that the incident ended when the front door opened.  She acknowledged that "couldn't have happened because the front door was right by the downstairs bathroom."  Victim explained that she told the investigator that the front door opening prompted the incident to end because she "was trying to find a reason for why it had ended" and that "seemed like the closest to the truth."  The first incident was the basis for the count 1 charge of forcible lewd acts upon a child under age 14.

The second incident also occurred in the downstairs bathroom when victim was about 11 years old.  Defendant pushed her against the wall, removed her pants and shirt, rubbed his penis around her vagina, and inserted it into her vagina.  Victim put her clothes back on and tried to leave but defendant blocked her way.  He then pushed her down, put his penis in her mouth, and moved his hips back and forth.  Those events formed the basis for counts 2 through 5, which charged defendant with two counts of

5

forcible lewd acts upon a child under age 14 and two counts of aggravated sexual assault upon a child under age 14.

The third incident victim recalled took place in the master bedroom when she was about 12 years old. She was wearing her mother's lingerie and defendant used a video camera to film himself penetrating her vagina with his fingers. In connection with that alleged conduct, defendant was charged with one count of forcible lewd acts upon a child under age 14 (count 8) and one count of aggravated sexual assault upon a child under age 14 (count 7).

The fourth incident, which occurred a few months after the third, also involved a video camera. Defendant and victim were in the master bathroom. Victim was up against the wall with her back to the defendant. He made her spread her legs apart and again filmed himself penetrating her vagina with his fingers. Victim conceded on cross-examination that she had previously testified that her back was against the wall. She explained the discrepancy by saying that "[t]hese things happened a lot" and she had a hard time keeping the incidents straight. The fourth incident formed the basis for counts 9 and 10, which charged defendant with aggravated sexual assault upon a child under age 14 and forcible lewd acts upon a child under age 14, respectively.

The fifth incident victim recounted involved uncharged conduct. Victim testified that the defendant came into the bathroom while she was showering, pulled back the shower curtain, and took pictures of her.

Victim was approximately 14 years old at the time of the sixth incident--the Winter Break rape. "[A]round winter break," defendant took her into the upstairs bathroom and pushed her against the counter. From behind, he pulled down her pants and she felt his penis pressing into her vagina. When asked whether he penetrated her vagina victim responded, "I mean, I remember it hurting. So I think a little bit but I don't--" The prosecutor asked victim "did you used to believe that event had taken place a couple days after New Year's?" Defense counsel objected to the question as leading.

6

After that objection was sustained, the following exchange took place between the prosecutor and victim:

"Q: At any time have you said that event took place a couple days after New Year's?

"A: Yes.

"Q: And do you still believe that event happened a couple days after New Year's?

"A: No.

"Q: And why is that?

"A: Because there were records that he was in the hospital. [¶] . . . [¶] In the last hearing they showed records . . . ."

Victim further explained, "I mean, I know it couldn't have taken place during that time now because he, like, there were records of him being in the hospital but I know that the event happened. I just--it just must have happened at a different time." Defendant was not charged in the second trial in connection with the alleged Winter Break rape.

On cross-examination, defense counsel confronted victim with her testimony at the first trial--which was referred to as a "prior hearing" at the second trial--that the rape occurred a few days into 2007. She responded that she "had been mistaken about the time it had taken place." She claimed not to recall insisting in the prior proceeding that the rape had taken place shortly after New Years even after being shown hospital records indicating the defendant was in the hospital at that time.

Victim next testified to a seventh incident that occurred in June 2007 when she was 15 years old. Defendant came into her bedroom and grabbed her. She tried to resist but he overpowered her and pushed her against the counter in the upstairs bathroom. He covered her eyes, pulled her pants down, and put his penis in her vagina. On cross-examination, defense counsel confronted victim with her testimony about the June 2007 incident at the first trial when she said on direct that she was raped but then denied it on

7

cross-examination. Victim explained that on cross-examination in the prior proceeding she was confused and thought defense counsel was asking about a different incident. The seventh incident was the basis for count 11 (former count 14), charging defendant with forcible lewd acts upon a child aged 14 or 15.

The victim testified about an eighth incident, alleging defendant made her orally copulate him in the master bedroom. When she said she did not want to perform the act he offered to dip his penis in juice to make it taste better. He then put his penis in her mouth. Victim could not remember when the eighth incident occurred. She acknowledged on cross-examination that she had not mentioned the detail about defendant's offer to dip his penis in juice at the prior hearing or to investigators. The oral copulation was charged in count 6.

Lastly, victim testified that when she was 11 or 12 years old defendant was helping her assemble a bed in her bedroom. He pulled down her pajama pants and snapped a picture with his cell phone. Victim heard her mother and defendant fighting about the photo the following day. Defendant said a friend had sent it to him. Victim's mother asked victim if the photo depicted her. Afraid to tell the truth because defendant was present and looked angry, victim said no. Defendant was not charged in connection with that incident.

Victim testified that she never told her mother about the molestation because she worried her mother would get angry or disbelieve her. She did not tell her father, with whom she lived half the time, because she feared hurting or disappointing him. The first person victim confided in about the abuse was her best friend, Tori. Victim first told Tori about the abuse when they were both in the eighth grade. Victim could not recall the specifics of those conversations other than that Tori urged victim to report the abuse to an authority figure.

When victim was a freshman or sophomore in high school the guardian of her friend, Jessica, called victim's father and informed him that victim might have been

8

abused by defendant. Victim's father discussed the call with victim and she "told him it had only happened once" and not to tell her mother. Victim falsely told Tori that her father was not going to do anything about the abuse because "money was tight and . . . it would be hard without the financial help from my mom." Victim testified she did not lie to Tori; her father had mentioned money issues in a prior conversation and she "used it as an excuse not to have to tell [Tori] that [she, victim,] wasn't ready to tell anyone still."

### 3. Tori

Tori, victim's best friend in the eighth grade and high school, testified that victim first told her defendant was "do[ing] things" to her in the summer of 2006, following their graduation from eighth grade. According to Tori, in that first conversation, victim told her defendant had made her orally copulate him and had rubbed his penis along her butt crack. Between summer 2006 and the end of 2007, Tori and victim discussed the abuse often. Tori recalled victim saying defendant would try to come in while she was in the shower and would put his hand up her shirt or skirt. At some point victim also told Tori the defendant had put his penis in her vagina.

Tori urged victim to tell someone about the molestation but victim said she did not want to and told Tori not to tell her mother. Tori initially respected victim's wishes, but eventually told her mother that victim was being abused. She could not recall which details she told her mother and which she withheld.

### 4. Roxanne Clair

Tori's mother, Roxanne Clair, testified that in early 2007 Tori disclosed that she was concerned about victim and implied that victim was being sexually abused by defendant. Tori "mentioned things like [defendant] watching [victim] take a shower or pictures that he took when she was younger." Clair never knew about "specific acts" of sexual abuse. Clair understood from Tori that victim did not want to talk about the situation, did not want her mother to find out, and would deny the accusations if anyone asked her about them.

9

Clair contacted Child Protective Services to report her concerns about victim in February 2008.

### 5.    *Krissi Durant*

Krissi Durant testified that in 2008 she was a sexual assault detective with the Santa Cruz County Sheriff's Office. On Friday, February 8, 2008, a Child Protective Services social worker informed Durant about allegations of defendant's sexual abuse of victim. At noon that day, Durant went to victim's high school to interview her. School administrators called victim out of class and Durant spoke with her in a private office at the school. After Durant introduced herself and said she was there to discuss information child protective services had received, victim began crying. During the interview victim cried a lot and was short with her answers.

Victim made a pretext call to defendant the following Tuesday. She called from the sheriff's office using her cell phone. Durant recorded the call, which was played for the jury.[2]

Victim began the call by telling defendant she had been talking to her school counselor about "stuff going on at home that [she] didn't like," but that she had not told the counselor about defendant "touching" her. Defendant responded "Was I drunk or something? I mean that wasn't me. Are you sure? I mean, what about your dad?" Victim then asked, "what about the pictures you took like when you picked the lock, and I was in the shower, and you came in with a camera and started taking pictures?" Defendant initially denied doing so, saying "No," "I don't remember that," and "I would never do that." Victim insisted defendant remembered but was denying it and he responded, "Well . . . even if, I mean, I didn't deny it, if I said so, I would go to jail. Do you understand? If I said so on the phone, you know what I mean?"

---

[2] We recounted most of the dialogue from the transcript of the pretext call in our prior opinion. (*Poletti*, *supra*, H035544.)

Victim asked defendant "why" and he responded "maybe you remind me of your mom. . . . I couldn't tell you why, I mean, other than maybe I'm sick and need just to not do drugs. . . . I mean, maybe I mis-used my affection for you. You know, showed my love the wrong way." Later, defendant continued, "if, you know, you say this to people, and if you have to, you have to. You know what I mean? But I'll go to jail, and the marriage is over, and my life is over, and I won't be able to see my kids again. But I need to do whatever it takes to make, you know, things right with you." When victim again pressed defendant to explain "why" he said "I don't know. You were a pretty little girl. I don't know. I mean, you know, I took affection I needed from you. I don't know. Because I know you loved me. I don't know. You know what I mean? I mean maybe because I didn't think you would tell."

Victim asked defendant to "promise me like you'll never touch me again" he responded "I--I promise, never ever ever. I'm not--I won't even give you a hug unless you want me to. You are safe, and I swear I'm gonna look at not doing drugs and whatever it takes. I mean, I--I'm probably in denial about the whole thing then." Defendant mentioned being in denial two other times during the call saying "you know, it's so horrible I must be in denial about it. I mean, I remember playing with you. You know what I mean? But . . ." and "I'm sure it was misguided affection. Sick. I'm sorry. There's . . . I'm sure I'm in denial. I mean, you know what though? You have nothing to worry about from me. Do you believe that?"

Victim also asked defendant why he would "want to touch [her] and like have sex with [her] and stuff" when she was so young. Defendant answered: "I don't, I don't know . . . . Like I said, it must be some mental problem I have. I mean no one, no one has ever, you know, touched you, right?" Victim responded "No."

Victim asked defendant "Do you still have those videos that you took when I was in mom's lingerie?" "No. No. No way," said defendant, "I probably erased them or destroyed them, or I have the tape in the room. I'll go over them to make sure. I mean,

11

your mom looks at those tapes too. I mean, if there's something on there, I better find it." He also told victim he never showed pictures to anyone or put them on the Internet.

Officer Durant reached defendant on his cell phone in the evening following the pretext call. Defendant met her at the sheriff's office that night, at which point he was arrested. Defendant did not have his cell phone with him at the time of his arrest and it never was recovered.

Officer Durant interviewed Tori in April 2008. At that time, Tori stated victim had said defendant took pictures of her in the shower and videotaped her while she was wearing her mom's lingerie. Tori said nothing about defendant raping victim or rubbing his penis against her backside.

### 6. Search Warrant

Todd Phillips, who was a deputy sheriff in Santa Cruz County in February 2008, testified that he and other officers served a warrant to search defendant's residence on the afternoon of February 12, 2008, a few hours after the pretext call took place. Officers seized lingerie, digital cameras, video cameras, computers, videotapes, undeveloped camera film, DVDs, and CDs from the home.

Ervin Heartsner, a retired police officer who performs computer forensics work for the Santa Cruz County Sheriff's Office, testified that he examined defendant's computer, which was seized during the search. He found pictures and videos of victim's mother (defendant's wife) in which she was nude or partially clothed. In some images she was engaged in sex acts, including oral copulation, vaginal intercourse, and digital penetration. Where she was engaged in sex acts with a man, the man appeared to be the one filming or taking the pictures and his face was not visible. Heartsner also found pornographic images on the computer. Some depicted adult women, some depicted children. He did not find any images depicting molestation or abuse of victim.

### 7. Victim's Mother

Victim's mother testified that she once saw a picture on defendant's cell phone

12

showing a woman from the waist to the mid-thigh. The woman was naked, although flannel pants were visible in the picture. Victim was about 14 years old at the time. Thinking it was a picture of victim because the flannel pants resembled victim's pajamas, victim's mother confronted defendant in the master bedroom. He denied the picture was of victim, saying a friend had sent it to him. Victim's mother then went to victim's room and asked if defendant had ever taken a picture of her. She said he had not.

### D. *Verdict and Sentencing*

On September 10, 2013, the court granted defendant's motion for acquittal of the forcible rape charged in count 12 (former count 15) for insufficient evidence. (§ 1118.1.)

The jury deliberated for three full days. On September 18, 2013, jurors found defendant guilty of counts 8 and 10, which charged two counts of forcible lewd acts upon a child under age 14 and were based on two incidents in which defendant videoed himself digitally penetrating victim. The jury was unable to reach verdicts on the other charges. Therefore, the court declared a mistrial as to counts 1 through 7, 9, and 11.

The court sentenced appellant to a term of 18 years eight months. On count 8, the court imposed the upper term sentence of eight years. The court imposed a consecutive upper term sentence of eight years for count 10. On count 16, the dissuading a witness conviction from the first trial, the court imposed a consecutive midterm sentence of two years. Finally, on count 17, the possession of child pornography conviction from the first trial, the court imposed a consecutive eight month term (one-third of the midterm sentence).

### E. *Contempt*

During the trial, the court issued an order to show cause to the prosecutor, Assistant District Attorney Ross Taylor, as to why he should not be held in contempt for comments he made to the court outside the presence of the jury. The order to show cause was based on the following exchange:

13

"THE COURT: Mr. Taylor, your obvious disdain for selected rulings of the Court is totally unprofessional. The way you push back, and it's been almost from the very beginning of the case. And, you know--

"MR. TAYLOR: Are you serious?

"THE COURT: Yes, I am totally serious. It's not a good time to engage me in argument about it--

"MR. TAYLOR: Ya, well, you know--

"THE COURT: Mr. Taylor, because I'm not going to listen to you. And you are increasing my ire--

"MR. TAYLOR: I'm not interested in what you have to say. I don't know if I could be any less interested. Some of the rulings that you've made are just outrageous, Your Honor. . . ."

Following a December 20, 2013 hearing, the court issued an order and judgment of contempt. In doing so, the court characterized the exchange above as "the culmination of a continuum of insolent and inappropriate behavior by [the prosecutor] that occurred throughout the trial." The court ordered the prosecutor to pay a $250 fine.

## II. DISCUSSION

### A. *Admission of Evidence of Uncharged Rapes of Which Defendant Was Previously Acquitted*

Defendant contends the court erred under *People v. Griffin* (1967) 66 Cal.2d 459 (*Griffin*) and its progeny in admitting victim's testimony about the alleged Winter Break and June 2007 rapes without informing the jury that he had been acquitted of rape charges based on those incidents. The Attorney General responds that *Griffin* does not apply because victim's testimony was not admitted pursuant to Evidence Code section 1108 and the jury was not permitted to use it to conclude that defendant had a propensity to commit the charged crimes.

14

## 1.  *Procedural Background*

As noted, defendant moved to admit evidence of the alleged Winter Break and June 2007 rapes.  The defense sought to confront victim with her prior testimony insisting the Winter Break rape occurred while defendant was in the hospital and her prior self-contradictory testimony as to whether she was raped during the June 2007 incident.  The prosecutor did not object and defendant's motion was granted on the understanding that the jury would not learn of the acquittals.

The prosecution elicited testimony from victim about the Winter Break rape and the June 2007 rape in its case in chief.  Victim varied from her testimony in the first trial regarding the Winter Break rape, conceding it could not have taken place in the first few days of 2007 because defendant was in the hospital at that time.  Consistent with her direct testimony in the first trial but inconsistent with her testimony on cross-examination in that trial, victim testified that defendant raped her in June 2007.

Towards the end of the trial, defendant requested the jury be instructed that he was acquitted of the uncharged Winter Break and June 2007 rapes.  Defense counsel argued that victim's testimony on direct examination regarding those incidents was akin to Evidence Code section 1108 propensity evidence.  The court denied defendant's request, reasoning a limiting instruction would prohibit the jury from using the testimony regarding uncharged rapes as propensity evidence.

The court instructed the jury as follows:  "The defense presented evidence concerning [victim]'s allegations that the defendant committed two forcible rapes, the first involving the 'Winter Break' incident and the second involving the alleged June of 2007 incident.  Neither allegation is charged in this case as forcible rape. [¶] The sole purpose for which evidence of the Winter Break incident was presented, and the sole purpose for which you may consider it, is a[s] it pertains to the credibility of [victim] with regard to her testimony as to the offenses with which defendant is charged.  Do not consider the evidence as it relates to the Winter Break forcible rape allegation for any

15

other purpose. [¶] You may consider the evidence concerning the alleged incident in June of 2007 for the purposes of determining whether the People have proven defendant's guilt beyond a reasonable doubt as to the charge of a lewd act upon a child who was 14 or 15 years old as alleged in count 11 and for the purpose of evaluating [victim]'s credibility as it relates to the charged offenses. You may not consider this evidence for any other purposes."

### 2. *Legal Principles*

In *Griffin*, the defendant was tried for murdering a woman after he attempted to rape her. The trial court admitted evidence that the defendant had raped another woman but excluded evidence that he was acquitted of that alleged rape. Our Supreme Court concluded evidence of the rape was "admissible because the similarities between the crimes made evidence of the [rape] relevant to prove that [the murder victim's] injuries were not accidental but inflicted by defendant and to prove that he intended to rape her." (*Griffin*, *supra*, 66 Cal.2d at pp. 464-465.) However, the *Griffin* court concluded the trial court erred in excluding evidence the defendant was acquitted of the rape. (*Id.* at p. 465.) Noting that "evidence of other crimes always involves the risk of serious prejudice," the court reasoned that "the rule that a properly authenticated acquittal is admissible to rebut prosecution evidence of guilt of another crime" "is fair to both the prosecution and the defense by assisting the jury in its assessment of the significance of the evidence of another crime with the knowledge that at another time and place a duly constituted tribunal charged with the very issue of determining defendant's guilt or innocence of the other crime concluded that he was not guilty." (*Id.* at p. 466.) The *Griffin* court recognized that, "[b]ecause of the requirement of proof of guilt beyond a reasonable doubt, evidence of an acquittal is not, of course, as convincing of innocence as a judgment of conviction is convincing of guilt." (*Id.* at p. 466, fn. 3.) But, the court reasoned, "this fact goes to the weight not the admissibility of the evidence." (*Ibid.*)

16

*Griffin* has been applied in cases involving the admission of a defendant's alleged prior bad acts under Evidence Code section 1101 and the admission of uncharged sex offenses under Evidence Code section 1108.[3] (*Mullens*, *supra*, 119 Cal.App.4th at pp. 663-666 [surveying *Griffin*'s progeny and applying its rule for the first time in the context of Evid. Code, § 1108 propensity evidence].)  In *Mullens*, a sex offense prosecution, evidence the defendant had committed an uncharged sex offense was admitted under Evidence Code section 1108 to show he had a propensity to commit sex crimes.  The *Mullens* court concluded that the rationale underlying *Griffin* applied equally in the context of Evidence Code section 1108 propensity evidence because such evidence "involves the risk of serious if not severe prejudice."  (*Mullens*, *supra*, at p. 665.)

We review de novo the trial court's conclusion that the *Griffin* rule did not, as a matter of law, apply here.

### 3.     *Any Error Was Not Prejudicial*

At issue in this appeal is whether the *Griffin* rule applies where evidence of uncharged sex crimes is admitted for the limited purpose of assessing victim's credibility.  We need not decide that question, however.  Even assuming the court erred in refusing to inform the jury about defendant's acquittals, that assumed error did not prejudice defendant.

Before addressing prejudice, we note the Attorney General's contention that evidence of the uncharged rapes was admitted "only to *attack* the [victim's] credibility" is unpersuasive.  (Italics added.)  We would be inclined to agree if evidence of the uncharged rapes had first been introduced by defense counsel and the prosecutor had

---

[3] *Griffin* itself was decided "only a few months after [Evidence Code] section 1101 became operative" and "did not discuss [Evidence Code] section 1101," but instead "relied on the common law rule that 'competent and otherwise admissible evidence of another crime is not made inadmissible by reason of the defendant's acquittal of that crime.' " (*People v. Mullens* (2004) 119 Cal.App.4th 648, 666 (*Mullens*).)

17

simply questioned victim about the incidents on redirect in an effort to rehabilitate her credibility. But that is not what transpired. Rather, the prosecutor elicited testimony about the uncharged rapes from victim on direct examination. He elicited that testimony in his case in chief, not to discredit his principal witness, but to blunt the impact of defense counsel's cross-examination. Accordingly, evidence related to the uncharged rapes was admitted for a broader purpose than the Attorney General contends.

Turning to prejudice, the question is whether it is reasonably probable that a result more favorable to defendant would have been reached had the jury been informed of defendant's acquittals. (*Mullens*, *supra*, 119 Cal.App.4th at p. 669; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Our "review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, [we] may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*People v. Breverman* (1998) 19 Cal.4th 142, 177.)

Defendant was convicted of two counts of violating section 288, subdivision (b). The elements of an offense under that provision are: (1) physical touching of a child under age 14; (2) for the present and immediate purpose of sexually arousing or gratifying the defendant or victim; and (3) the touching was accomplished by use of force, violence, duress, menace, or fear of injury. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.)

There was evidence corroborating victim's testimony that defendant videotaped her both in the master bedroom while she was wearing her mother's lingerie and a few months later when she was in the bathroom. Specifically, defendant appears to admit such conduct during the pretext call; Officer Durant testified that Tori told her that victim described such conduct; and lingerie and video equipment were found in the home. The

18

pretext call also corroborated victim's testimony that defendant touched her sexually during those incidents. On that call, defendant said he had "showed [victim his] love the wrong way." He offered a number of possible reasons for doing so: "[she] remind[ed him] of [her] mom"; "[he's] sick"; "[she was] a pretty little girl"; he needed "affection"; and he "didn't think [she] would tell." He also said that if she told people he would "go to jail" and never "see [his] kids again." Taken together, these statements strongly suggest defendant touched victim for the present and immediate purpose of sexually arousing himself, and thus support victim's testimony that defendant digitally penetrated her during the videotaping incidents.

No evidence was introduced to substantiate victim's testimony as to the final element of counts 8 and 10, the use of force, violence, duress, menace, or fear of injury during the incidents.[4] Thus, to convict defendant on counts 8 and 10, jurors had to credit victim's testimony on that point. The question for us, then, is whether it is reasonably probable that at least one juror would not have done so had they learned defendant had been acquitted of the uncharged rapes. (*People v. Soojian* (2010) 190 Cal.App.4th 491, 520 ["[U]nder the *Watson* standard a hung jury is considered a more favorable result than a guilty verdict."].) And, we embark on that inquiry guided by the fact that the acquittals are only slightly probative of victim's lack of credibility. (*Griffin*, *supra*, 66 Cal.2d at p. 466, fn. 3 ["[b]ecause of the requirement of proof of guilt beyond a reasonable doubt, evidence of an acquittal is not . . . as convincing of innocence as a judgment of conviction is convincing of guilt"].)

---

[4] Even if jurors might reasonably have inferred that the victim must have touched *herself* at defendant's instigation during the lingerie incident, they were not instructed on a constructive touching theory of guilt. (*People v. Lopez* (2010) 185 Cal.App.4th 1220, 1233 ["section 288 is violated by 'any touching' of an underage child, including a constructive touching by the victim at the defendant's direction, 'accomplished with the intent of arousing the sexual desires of either the perpetrator or the child' "].)

The jury heard other evidence undermining victim's credibility. For example, victim testified that, to conceal the fact that she had downplayed the alleged molestation when confronted by her father, she told Tori that her father was not going to do anything because of money problems. Relatedly, victim hid the extent of the molestation from her father. She denied that the picture on defendant's cell phone depicted her when her mother confronted her. She effectively testified that she invented her explanation to investigators for why the first alleged incident ended, saying she "was trying to find a reason for why it had ended" and that "seemed like the closest to the truth." And victim's credibility with respect to the uncharged rapes was impeached with her prior inconsistent testimony about those incidents. Evidence of the acquittals was, accordingly, cumulative of other evidence defendant used to undermine victim's credibility generally and with respect to the uncharged rapes specifically. It is not likely, therefore, that evidence of the acquittals would have impacted the decision of a juror to credit victim's testimony about the alleged conduct related to the video recordings.

We acknowledge that the jury deliberated for more than three days and hung on nine of 11 charges. (*People v. Cardenas* (1982) 31 Cal.3d 897, 907 [jury deliberations of 12 hours indicated the closeness of case]; *People v. Brown* (1993) 17 Cal.App.4th 1389, 1398 [jury's inability to reach a verdict on one of the two counts showed closeness of case].) And, as noted, the jury had to credit victim's testimony as to the use of force to convict defendant of counts 8 and 10. Nevertheless, given the pretext call's strong corroboration of the other elements of those counts, the other evidence available to defendant to undermine victim's credibility, and the slight probative value of the acquittals, we cannot say it is reasonably probable the jury would have reached an outcome more favorable to defendant had it learned of the acquittals.

### B.     *Prosecutorial Misconduct*

Defendant also raises four claims of prosecutorial misconduct.

20

### 1. Discovery Violation

Defendant contends the prosecution committed misconduct by failing to disclose material it was required to provide to the defense under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and section 1054.1. Pursuant to *Brady*, the prosecution has a duty under the Fourteenth Amendment's due process clause to disclose evidence that is both favorable to the defendant (because it is exculpatory or impeaching) and material to guilt or innocence. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.) State law requires the prosecution to "disclose to the defendant or his or her attorney . . . [¶] . . . [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial . . . ." (§ 1054.1.) Upon a showing that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court "may make any order necessary to enforce the provisions" of the statute, "including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order." (§ 1054.5, subd. (b).) The court may also "advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Ibid.*) A violation of section 1054.1 is subject to the harmless-error standard set forth in *Watson.* (*People v. Verdugo* (2010) 50 Cal.4th 263, 280 (*Verdugo*).)

Defendant maintains the prosecutor violated *Brady* and section 1054.1 by failing to disclose statements victim made before the second trial indicating that she no longer believed the Winter Break rape occurred a couple of days after the New Year.[5] The Attorney General asserts, without explanation, that "[t]here was no discovery violation."

---

[5] In his opening brief, defendant confined his discovery violation argument to the alleged Winter Break rape. In reply, he attempts to extend it to the alleged June 2007 rape. We consider the argument forfeited as it relates to the alleged June 2007 rape. (continued)

21

As discussed above, at the first trial victim was adamant the Winter Break rape took place in the early days of 2007, even when confronted with records showing defendant was in the hospital at that time. At the second trial, the prosecutor's first question to victim about the timing of the Winter Break rape was "did you used to believe [the Winter Break rape] had taken place a couple days after New Year's?" Victim explained that she did used to hold that belief, that she no longer did so because of the hospital records, and that the rape must have occurred at another time. On cross-examination, victim testified that she told the prosecutor prior to taking the stand that she no longer believed the Winter Break rape occurred while defendant was hospitalized. Outside the presence of the jury, the prosecutor represented to the court that victim never made any statements to him that required disclosure. He stated that in his pretrial conversation with victim he merely told her she would "need to explain" the timing of the Winter Break rape. The trial court credited the prosecutor and found no discovery violation.[6]

The phrasing of the prosecutor's question--"did you *used to* believe [the Winter Break rape] had taken place a couple days after New Year's"--strongly supports the conclusion that he was aware victim planned to change her testimony. (Italics added.) How else would he know the belief she adhered to at the first trial was one she "used to," but no longer, held? Nevertheless, we conclude that there was no *Brady* violation because victim's statement that the Winter Break rape did not occur when defendant was in the hospital was not favorable to his case. Accordingly, it "did not fall within the

(*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [refusing to consider "issue raised initially in the reply brief of an appellant"].)

[6] At the posttrial contempt hearing, the trial court stated "it appears to me now in hindsight having conducted the entire trial, that [victim] had in fact informed [the prosecutor] prior to her testimony that . . . her view . . . about the winter break rape allegation had changed."

22

scope of *Brady*, *supra*, 373 U.S. at page 87." (*Verdugo*, *supra*, 50 Cal.4th at p. 281.) While we do find there was a section 1054.1 violation,[7] defendant does not demonstrate prejudice. A section 1054.1 violation is prejudicial "and thus is a basis for reversal only where it is reasonably probable, by state-law standards, that the omission affected the trial result." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1135, fn. 13, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Defendant says he was prejudiced by the discovery violation because "[h]e lost his ability to choose to exclude entirely [victim's] allegation of" the uncharged Winter Break rape and, alternatively, because the jury was not advised of the prosecution's failure to disclose. It is not clear defendant would have succeeded had he sought to exclude the evidence. The prosecutor could have sought and obtained permission to introduce evidence of the uncharged rape as propensity evidence under Evidence Code section 1108 or under Evidence Code section 1101, subdivision (c). (Evid. Code, § 1101, subd. (c) [specific instance of conduct admissible "to support or attack the credibility of a witness"].) However, because the Attorney General does not make that assertion, we shall assume evidence of the uncharged Winter Break rape would not have been introduced but for the discovery violation. The question, then, is whether it is reasonably probable that a result more favorable to defendant would have been reached absent that evidence. We think not.

---

[7] The prosecutor represented to the trial court that there was no report of the victim's undisclosed statements. That is irrelevant to the question of whether a discovery violation occurred. "While defense counsel does not have a duty to obtain written statements from witnesses [citation], counsel is not entitled to withhold any relevant witness statements from the prosecution by the simple expedient of not writing them down. '[S]uch gamesmanship is inconsistent with the quest for truth, which is the objective of modern discovery.' " (*Roland v. Superior Court* (2004) 124 Cal.App.4th 154, 165.)

23

Apart from the Winter Break rape, the jury heard victim testify about eight incidents of sexual abuse, including two other times defendant put his penis in her vagina and two forced oral copulations. Thus, the Winter Break rape testimony was no more inflammatory than victim's other testimony, reducing the likelihood its admission was prejudicial. Moreover, jurors did not convict defendant of the charges to which the Winter Break rape evidence most closely pertained--namely, counts 2 and 3, which charged defendant in connection with allegedly inserting his penis into victim's vagina in the downstairs bathroom, and count 11 (former count 14), charging defendant in connection with the alleged June 2007 rape. This verdict convinces us that the jury's decision to convict defendant on counts 8 and 10 was not influenced by the Winter Break rape evidence. Furthermore, the admission of evidence of the uncharged Winter Break rape assisted defendant by enabling him to impeach victim with her prior inconsistent testimony. For all of these reasons, no reasonable probability exists that, had the Winter Break rape evidence been excluded, the result would have been more favorable to defendant.

Defendant also suggests that, had the trial court recognized the discovery violation during trial, pursuant to section 1054.5, it should have informed the jury of that violation. The Attorney General responds that it "is not reasonably probable that the result would have been any different if the jury had been informed of the alleged discovery violation . . . ." It is not clear that whether a particular section 1054.5 sanction would have changed the trial outcome is the correct question on appeal. Because the trial court found no discovery violation during the trial, it never considered imposing a sanction and defendant is not appealing an order issued under section 1054.5. (See *People v. Bowles* (2011) 198 Cal.App.4th 318, 327 ["Once the trier of fact has rendered a verdict it is no longer possible to remedy a discovery violation by the sanctions outlined in section 1054.5; rather, the issue turns from remediation to an examination of whether the discovery violation prevented the defendant from obtaining a fair trial."].) In any event,

we agree with the Attorney General that it is not reasonably probable the result of the trial would have been more favorable to defendant had the jury been advised of the prosecutor's disclosure failure.

2. Griffin *Error*

Defendant next asserts the prosecutor committed so-called *Griffin* error (*Griffin v. California* (1965) 380 U.S. 609) by commenting during closing argument that defendant did not testify. We find no error because the prosecutor's comments, fairly read, did not comment on defendant's silence at trial.

In his closing, the prosecutor made the following statements: "Think about how superficial the defense has been in this case going on and on about why didn't she tell? Why didn't she tell? I mean, the argument seems to be she didn't tell her mother. She didn't tell her father the whole truth so she must be lying. She must be lying because she never told until, they say, it was convenient for her to make up these false allegations. [¶] Ask yourself who's the one person who knows best why she didn't tell? Who is the person who knows? And it's the defendant.[8] [¶] . . . [¶] On the pretext call. The defendant says 'I didn't think you'd tell.' And he's the one who knows best. The evidence demonstrates that." The prosecutor went on to argue that defendant gained victim's trust over time and manipulated her to keep her from disclosing the molestation.

Under *Griffin*, a prosecutor may not comment, directly or indirectly, upon a defendant's failure to testify. (*Griffin v. California*, *supra*, 380 U.S. at p. 615.) But *Griffin* does not extend to comments on the state of the evidence. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1229.) In our view, the prosecutor's comments are best viewed as referencing a piece of evidence, the pretext call, and not as an implicit suggestion that defendant should have testified. "Contrary to defendant's argument, on this record, there is no reasonable likelihood the jury understood the prosecutor's remarks as an invitation

---

[8] Defense counsel made a *Griffin* objection, which was overruled.

to draw an improper inference of guilt from defendant's decision not to testify." (*People v. Taylor* (2010) 48 Cal.4th 574, 633.)  "Defendant's claim of *Griffin* error therefore fails."  (*Ibid.*)

### 3. Seeking to Elicit Inadmissible Testimony

Third, defendant says the prosecutor committed misconduct by repeatedly attempting to elicit inadmissible testimony from a defense investigator about the time and expense associated with his investigation.

On cross-examination, the investigator testified that he had spent approximately 80 hours searching for one defense witness, Aaron Allen, and that he charged $225 per hour.  Prosecutor Ross Taylor then questioned the investigator as follows:

"[MR. TAYLOR]:  You spent time looking for Tori . . . ; correct?

"[INVESTIGATOR]:  Yes.

"MR. LEVINE:  Your Honor, this is irrelevant.

"THE COURT:  Sustained.

"BY MR. TAYLOR:

"Q:  You spent time attempting to locate Olivia Freedman?

"MR. LEVINE:  Irrelevant.

"THE COURT:  Sustained.

"BY MR. TAYLOR:

"Q:  You interviewed Garret Olson?

"MR. LEVINE:  Your Honor, this is--

"COURT:  Sustained.

"MR. LEVINE:  Give the instruction not to continue this.

"THE COURT:  We're concerned with the interview Aaron Allen.  Confine ourselves to that.

"BY MR. TAYLOR:

26

"Q: So how much of the time you spent in connection with this case is the 80 hours that you have described?

"MR. LEVINE: Objection. Irrelevant.

"THE COURT: Sustained."

" 'The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct.' " (*People v. Bell* (1989) 49 Cal.3d 502, 532 (*Bell*).) "Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected." (*People v. Smithey* (1999) 20 Cal.4th 936, 960.)

Well before the fourth sustained objection, "it should have been apparent to the prosecutor that" the trial court would not permit questions about time spent investigating witnesses other than Aaron Allen. (*People v. Trinh* (2014) 59 Cal.4th 216, 249 (*Trinh*).) By continuing to pursue that line of questioning, the prosecutor appears to have "engaged in a deliberate attempt to put inadmissible and prejudicial evidence before the jury." (*Bell*, *supra*, 49 Cal.3d at p. 532.) Accordingly, we agree with defendant that the prosecutor committed misconduct.[9]

However, defendant has not shown the misconduct resulted in prejudice. "Generally, there is no prejudice where an objection is made and sustained." (*Trinh*, *supra*, 59 Cal.4th at p. 249.) "Because the trial court sustained each objection, no inadmissible testimony was heard by the jury." (*Ibid*.) And even if the prosecutor's questions alone implied to the jury that defendant spent significant sums on his defense, that was apparent from the investigator's testimony regarding his fees and the time he spent searching for Allen, which was elicited without objection. Accordingly, "the consequences of the improper questions fell far short of 'infect[ing] the trial with such

---

[9] The Attorney General asserts in a heading that "[t]he [p]rosecutor's [o]bjectionable [q]uestions [d]id [n]ot [a]mount to [m]isconduct," but it does not support that assertion with any substantive argument, asserting instead that defendant suffered no prejudice.

27

unfairness as to render the subsequent conviction a denial of due process' [citation], and there is no reasonable probability they influenced the verdict." (*Ibid.*)

### 4. Rude and Intemperate Behavior

Last, defendant contends the prosecutor's persistent questioning of the court's rulings in the jury's presence resulted in an unfair trial that violated his federal constitutional right to due process. We agree that the prosecutor, Ross Taylor, behaved poorly and is deserving of rebuke. However, defendant has failed to show that Taylor's repeated expressions of disrespect for the trial court deprived him of a fair trial.

In addition to his offensive statements to the court outside the presence of the jury ("I'm not interested in what you have to say. I don't know if I could be any less interested."), prosecutor Taylor exhibited rudeness while jurors were present. We begin with just four of numerous examples that illustrate prosecutor Taylor's behavior at trial. First, after the court overruled Taylor's objection that a question posed by defense counsel had been asked and answered, Taylor quipped: "So the different answer than she just answered for the same question?" Second, Taylor openly disagreed with a ruling sustaining a defense objection, asserting that his line of questioning "frankly [was] proper." Third, when the court instructed Taylor to "[s]top editorializing," Taylor retorted that he was "[h]ardly editorializing." Fourth, when the trial court sustained one of defense counsel's relevancy objections, Taylor responded "I'm not sure that it's irrelevant." These were not isolated incidents, as evidenced by the trial court's statements. When the court reprimanded Taylor outside the presence of the jury, it commented "[a]bout 80 percent of my evidentiary objections you want to argue in the presence of the jury about the appropriateness of my ruling. Stop it." And, the court described Taylor's inappropriate remarks during the hearing on his citation for contempt as "the culmination of a continuum of insolent and inappropriate behavior by [the prosecutor] that occurred throughout the trial."

28

"A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 (*Espinoza*).) "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*Ibid.*)

We agree with defendant that Taylor was rude and intemperate at times. We are unimpressed with the Attorney General's attempt to defend Taylor's unprofessionalism by blaming defense counsel for "bait[ing] and badger[ing]" him. "It is the duty of every member of the bar to 'maintain the respect due to the courts' and to 'abstain from all offensive personality.' [Citation.] A prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State. . . . Prosecutors who engage in rude or intemperate behavior, even in response to provocation by opposing counsel, greatly demean the office they hold and the People in whose name they serve." (*Espinoza*, *supra*, 3 Cal.4th at pp. 819-820; *People v. Bain* (1971) 5 Cal.3d 839, 849 ["A prosecutor's misconduct cannot be justified on the ground that defense counsel 'started it' with similar improprieties."].)

Taylor's conduct, however, did not infuse the trial with such unfairness that defendant's conviction constitutes a denial of due process. Assuming his conduct constituted a deceptive or reprehensible method to persuade the jury, we review the claims of misconduct under state law, asking whether it is reasonably probable the jury would have reached a different result in the absence of the prosecutor's misconduct. (*Espinoza*, *supra*, 3 Cal.4th at pp. 820-821.) Defendant argues the prosecutor's conduct made it appear that defense counsel and the court were allied against the prosecutor. We think it is more likely the prosecutor's "insolent and inappropriate" behavior alienated the

29

jury, rather than garnering their sympathy. Our conclusion finds support in the verdict. Of the 12 counts on which defendant was tried, the jury convicted him of just two, both of which involved conduct he appeared to admit to in the pretext call. The verdict, and the evidence supporting the convictions, convince us it is not reasonably probable the prosecutor's misconduct affected the trial's outcome.[10]

### C. *Cumulative Prejudice*

Defendant contends the cumulative effect of the claimed errors was to deprive him of his right to due process under the federal Constitution. Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to defendant absent a combination of errors. (See *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial."].) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have assumed the trial court erred in refusing to inform the jury about defendant's acquittals of the uncharged rapes. And we have found the prosecutor committed misconduct by violating his disclosure duties in connection with testimony about those uncharged rapes, attempting to elicit inadmissible testimony, and exhibiting disrespect for the trial court. In isolation, each error was harmless. These errors, which

---

[10] Section 6086.7 of the Business and Professions Code provides that when we reverse a conviction because of prosecutorial misconduct we must refer the matter to the State Bar for investigation with regard to the appropriateness of initiating disciplinary action against the attorney. (*People v. Hill* (1998) 17 Cal.4th 800, 853.) While Taylor's conduct does not require reversal, we nevertheless shall report the matter to the State Bar pursuant to our inherent judicial power to discipline attorneys. (*People v. Ryner* (1985) 164 Cal.App.3d 1075, 1087, fn. 5.) Accordingly, we hereby notify Ross Taylor that we are reporting this matter to the State Bar in accordance with the foregoing provisions. (See *People v. Pitts* (1990) 223 Cal.App.3d 606, 690.)

30

related to either the uncharged rapes evidence or the prosecutor's push back against the court's rulings, were no more prejudicial together. "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) No such showing had been made here.

## III. DISPOSITION

The judgment is affirmed. The Clerk of this Court is directed to forward a copy of this opinion to the California State Bar for review and further proceedings, if appropriate.

_____

                                          Walsh, J.*



        WE CONCUR:




_____

        Rushing, P.J.




_____

        Elia, J.






People v. Poletti
H040412

_____

     * Judge of the Santa Clara County Superior Court assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | Santa Cruz County Superior Court<br>Superior Court No. F16423 |
| Trial Judge: | Hon. Paul P. Burdick |
| Counsel for Defendant/Appellant:<br>Anthony Achilles Poletti | Law Office of Leonard B. Levine<br>Leonard B. Levine<br><br>Law Office of Michael D. Chaney<br>Michael D. Chaney |
| Counsel for Plaintiff/Respondent:<br>The People | Kamala D. Harris<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Catherine A. Rivlin<br>Supervising Deputy Attorney General<br><br>Allen R. Crown<br>Deputy Attorney General |

People v. Poletti
H040412