Filed 12/15/20  P. v. Shirley CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G058079 |
| v. | (Super. Ct. No. M-13359) |
| DWAYNE MICHAEL SHIRLEY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from an order of commitment of the Superior Court of Orange County, Gary M. Pohlson, Judge.  Affirmed.

Gerald J. Miller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

INTRODUCTION

A jury found Dwayne Michael Shirley to be a sexually violent predator under the Sexually Violent Predator Act, Welfare and Institutions Code section 6600 et seq. (SVPA).[1] The trial court ordered him committed to the Department of State Hospitals (DSH) for an indeterminate term.

Shirley does not dispute that he has been convicted of at least one predatory sex offense under the SVPA or that he suffers from pedophilic disorder. In addition, he does not contend that insufficient evidence supported the finding under the SVPA that he has a diagnosed mental disorder which prevents him from exercising volitional and/or emotional control over his actions, and he does not otherwise challenge the sufficiency of the evidence supporting the jury's finding he is a sexually violent predator.

Shirley raises two contentions of evidentiary error. First, Shirley contends the trial court erred by excluding proffered testimony by one of the two defense expert witnesses recounting details of the expert's other patients' behaviors that showed they lacked volitional control over their actions. Second, Shirley contends the trial court erred by allowing one of the two prosecution expert witnesses to testify on the issue of Shirley's lack of control in the context of nonsexual matters because he contends such testimony was irrelevant.

We reject both contentions of evidentiary error and affirm. Shirley's expert witness was permitted to testify about behaviors he learned about and observed that can demonstrate a lack of volitional control in the context of sexual matters and further testified that Shirley did not exhibit those behaviors. The trial court did not abuse its discretion by excluding as irrelevant additional evidence detailing such behaviors as demonstrated by the expert's other patients.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

The trial court did not abuse its discretion by permitting the prosecution's expert witness to testify whether Shirley exhibited volitional control in the context of nonsexual matters; the expert ultimately testified that Shirley lacked such control based on Shirley's conduct in relation to sexual matters. Even if the trial court erred in its evidentiary rulings, neither ruling was prejudicial. We also reject Shirley's contention of cumulative error.

SUMMARY OF RELEVANT PORTIONS OF THE SVPA

The SVPA authorizes the indefinite involuntary civil commitment of persons found to be sexually violent predators after they conclude their prison terms. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 646-647; *People v. McKee* (2010) 47 Cal.4th 1172, 1186-1187.) At trial on a commitment petition under the SVPA, the prosecution must prove three elements beyond a reasonable doubt: (1) the person has suffered a conviction of at least one qualifying "sexually violent offense," (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others," and (3) the mental disorder makes it likely the person will engage in future predatory acts of sexually violent criminal behavior if released from custody. (§ 6600; see §§ 6603, 6604; *People v. Shazier* (2014) 60 Cal.4th 109, 126; *People v. Yates* (2018) 25 Cal.App.5th 474, 477.)

The prosecution, therefore, must carry the burden of proving beyond a reasonable doubt "that because of a diagnosed mental disorder affecting the person's volitional or emotional control, '"it is likely he or she will engage in sexually violent behavior" if released.' [Citations.] 'Likely,' in this context, does not mean more likely than not; instead, the standard of likelihood is met 'when "the person presents a *substantial danger*, that is, a *serious* and *well-founded risk*, that he or she will commit such crimes if free in the community." [Citations.]'" (*People v. Shazier, supra*, 60 Cal.4th at p. 126.)

A "'[d]iagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).) "Expert testimony, specifically testimony regarding diagnosis of a current mental disorder, is an important element in an SVPA civil commitment proceeding." (*People v. Roa* (2017) 11 Cal.App.5th 428, 443.) "[E]xpert testimony is critical" because "the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's future behavior." (*People v. McKee*, *supra*, 47 Cal.4th at p. 1192.)

If the jury unanimously finds the person is a sexually violent predator, then he or she is committed for an indeterminate term to the custody of the DSH. (§ 6604.) Following commitment, the sexually violent predator is subject to annual mental examinations to determine whether he or she continues to meet the definition of a sexually violent predator. (§ 6604.9, subds. (a) & (b).)

## FACTS[2]

Shirley, who is now 49 years old, has been diagnosed with pedophilic disorder. Expert witnesses testified at trial that he also suffers from a combination of antisocial personality disorder, bipolar disorder and/or borderline disorder. He also has an intellectual disability manifested by, inter alia, his extremely low IQ test results and short-term memory problems.

---

[2] Given the limited scope of this appeal challenging evidentiary rulings pertinent to whether Shirley lacked volitional and emotional control in sexual matters so as to make it likely he will reoffend, our summary of facts is limited to provide relevant context for those rulings.

4

## I.

### SHIRLEY IS CONVICTED OF AT LEAST ONE QUALIFYING SEXUAL OFFENSE; HE HAS COMMITTED SEVERAL OTHER SEXUAL OFFENSES AGAINST YOUNG BOYS.

In 2000, Shirley molested D., a 10-year-old boy who suffered from an unspecified disability. The incidents of molestation included Shirley touching D.'s penis, Shirley having D. touch Shirley's penis, and Shirley orally copulating D. Shirley admitted he had touched D. and stated that, because of D.'s condition, he knew D. would never come to court to testify. The charge against Shirley regarding D. was dismissed.

In 2001, Shirley befriended a woman and her two young boys at a homeless shelter. Shirley took four-year-old G. and seven-year-old A. to the bathroom where he fondled both boys. He was convicted of committing lewd and lascivious acts against G., a child under 14 years of age, in violation of Penal Code section 288, subdivision (a).

In 2003, Shirley lived in the same apartment complex as six-year-old M.F. and his father. When M.F.'s father was arrested, M.F. was left in Shirley's care until M.F.'s grandmother arrived. Shirley took M.F.to his apartment where he sexually assaulted him. Both prosecution expert witnesses and both defense expert witnesses testified that Shirley's assault of M.F. resulted in a qualifying conviction of a sexual offense under the SVPA.

During an interview with a mental health professional, Shirley acknowledged having engaged in deviant sexual behavior with boys and stated he had almost 70 victims, most of whom were boys from homeless shelters.

## II.

### EXPERT TESTIMONY

Both of the prosecution's expert witnesses and both of Shirley's expert witnesses testified at trial that: (1) Shirley's conviction for committing a lewd and lascivious act on M.F. constituted a qualifying sexually violent offense under the SVPA; and (2) Shirley has pedophilic disorder. The following summarizes the expert witnesses'

testimony relevant to their opinions as to whether in light of his pedophilic disorder Shirley lacks volitional and/or emotional control in sexual matters and whether it is likely he would engage in future predatory acts of sexually violent criminal behavior if he were released from custody.

## A.

### *Prosecution Expert Dr. Charles Flinton*

Psychologist Dr. Charles Flinton first evaluated Shirley in 2011 to determine whether he qualified as a sexually violent predator. Dr. Flinton assessed Shirley again in 2014, 2017, and 2018. During more than one of his interviews, which included an interview in 2018, Shirley admitted his sexual attraction to prepubescent children. Dr. Flinton testified that in addition to pedophilic disorder, he found Shirley to have a mild intellectual disability, bipolar disorder, and antisocial personality disorder which exacerbate Shirley's primary diagnosis of pedophilic disorder.

Dr. Flinton concluded Shirley's pedophilic disorder predisposed him to commit further sexually violent acts as he lacked emotional and volitional control. Dr. Flinton noted that Shirley continued to commit sexual offenses even after he was confronted and faced consequences for his prior behavior and although he stated he did not like the part of himself that behaved that way. Dr. Flinton testified Shirley's failure to respond to consequences "really speaks to his inability to control his behavior, and there was nothing to tell [Dr. Flinton] that his behavior would stop because it hadn't." He explained Shirley's "sexual drive and compulsion to act out in this way was stronger than his ability to control his behavior." Dr. Flinton observed Shirley exhibited low empathy toward his victims; he knew he would cause them harm.

In his evaluation of Shirley, Dr. Flinton utilized actuarial tools. He considered peer associations, emotional regulation, cooperation with supervision, and physical condition. He considered the Static-99R and the Stable-2007 risk assessment tools, which he found to support his conclusion. He stated that as of 2018, Shirley was

doing better in treatment, but had failed to complete a sex offense treatment program and had poor attendance in recommended groups.

Dr. Flinton ultimately concluded Shirley was likely to engage in sexually violent, predatory criminal behavior as a result of his pedophilic disorder without appropriate treatment and custody.

B.

*Prosecution Expert Dr. Steven Jenkins*

Dr. Steven Jenkins is a psychologist with the DSH who, like Dr. Flinton, evaluated Shirley and found that he satisfied all of the requirements of a sexually violent predator under the SVPA. He conducted an initial commitment evaluation of Shirley in 2017 and interviewed and evaluated Shirley in 2018.

Dr. Jenkins testified that in addition to having pedophilic disorder, Shirley had antisocial personality disorder, borderline personality disorder, and a mild intellectual disability; unlike Dr. Flinton, he did not diagnose Shirley as having bipolar disorder. He testified that Shirley's pedophilic disorder predisposed him to commit sexual crimes while his other disorders and disability exacerbated that predisposition. Dr. Jenkins testified that Shirley's pedophilic disorder caused him to lack volitional and/or emotional control evidenced by his repeated abuse of young boys while knowing his conduct was wrong. He testified that Shirley does not have "a clear appreciation and recognition of the consequences of his actions." He further testified that the fact a patient does not act on his pedophilic disorder while in the hospital where he is without access to children does not mean the patient has volitional and emotional control. Dr. Jenkins noted Shirley demonstrated impulsive behavior and angered easily.

Dr. Jenkins concluded it was likely Shirley would engage in sexually violent, predatory criminal behavior as a result of his pedophilic disorder without appropriate treatment in custody. He formed his opinion after using the Static-99R, the

7

Structured Risk Assessment, Static-2002R, and Stable-2007 diagnostic tools and a psychopathy checklist for risk factors.

Dr. Jenkins acknowledged the availability of treatment options in the community, but stated he believed Shirley lacked the volitional control and sincerity to go to treatment; Shirley had not been receptive to treatment offered to him to date. He testified that Shirley's proposed release plan involving supervision through Regional Center which would connect him to community sex offender treatment programs was inadequate because such treatment would not be mandatory and there was "no clear means of managing him."

C.

*Shirley's Expert Dr. Christopher Fisher*

Dr. Christopher Fisher is a clinical forensic psychologist who interviewed Shirley in December 2017 and evaluated him in 2018 to determine whether he met the criteria of a sexually violent predator. Dr. Fisher concluded Shirley's pedophilic disorder did not qualify as a diagnosed mental disorder under the SVPA because it did not currently cause him emotional and volitional impairment to the point that he had serious difficulty controlling his sexual behavior.

Dr. Fisher testified that it is improper to assume that a person who has been properly diagnosed with pedophilic disorder "will always have difficulty controlling that part of themselves" as conditions change, with or without treatment, particularly with age. He stated he does not believe Shirley's intellectual disability exacerbates his pedophilic disorder or his impulsivity and immaturity. Dr. Fisher disagreed with other experts that Shirley has antisocial personality disorder.

He explained Shirley suffered from nonexclusive pedophilia which means he does not show an exclusive preference for children; exclusive pedophilia is a stronger and more significant risk factor for reoffending. Dr. Fisher testified about the tests and assessments, including the Static-99R assessment, upon which he relied in reaching his

opinion that Shirley was not likely to engage in sexually violent, predatory behavior at this point in his life.

D.

*Shirley's Expert Dr. Douglas Korpi*

Dr. Douglas Korpi is a forensic psychologist who, like Dr. Fisher, concluded Shirley has the nonexclusive form of pedophilic disorder. He testified that he believed Shirley to have borderline personality disorder and antisocial personality disorder as well, but neither disorder rose to the level of qualifying as a mental disorder under the SVPA. He explained that Shirley's "really wild" behavior is due to his borderline personality disorder which "waxes and wanes over time." He did not agree that Shirley has bipolar disorder. He further testified that there is no dispute Shirley "is in fact so wild and crazy" but that his pedophilic disorder is a "small aspect of his symphony of impulsivity."

He stated he found Shirley to have exhibited a lack of volitional control by "repeatedly doing things he thinks are naughty and he shouldn't do." Dr. Korpi testified that he has also shown a lack of emotional control and that his pedophilic disorder predisposes him to commit sexually violent acts.

Dr. Korpi testified about the tests and assessments he considered, including the Static-99R assessment, in forming his opinion about the likelihood Shirley would engage in further sexually violent acts. Dr. Korpi stated he considered that in 2006 and 2010, when Shirley was on parole, Shirley did not reoffend. Dr. Korpi testified he did not reoffend because "he was being watched by Regional Center" and that would be the arrangement again if he were released. Therefore, Dr. Korpi opined, Shirley would not reoffend because of Regional Center's supervision with which Shirley had cooperated in the past. Dr. Korpi acknowledged that, unlike a commitment under the SVPA which is involuntary, Regional Center's involvement would be voluntary if Shirley were released and Shirley would be free to opt out and walk away from Regional Center. Dr. Korpi

9

believed, however, that if released Shirley would not walk away because he would be a homeless, registered sex offender without family who has health conditions. Dr. Korpi stated Shirley is "like an 11- or 12-year-old" who is not going to run away.

Although Dr. Korpi believed Shirley would not likely reoffend with Regional Center's involvement, he also believed Shirley to be "a substantial danger" without it. Dr. Korpi testified: "Without Regional Center, he would be doomed to reoffen[d]" as "he is an impulsive man of limited IQ who likes anything male and so simply cannot help himself when in the company of males, including children."

PROCEDURAL HISTORY

In June 2011, the Orange County District Attorney filed a petition under the SVPA to commit Shirley as a sexually violent predator. That same month, the trial court found probable cause existed and ordered Shirley detained in a secure facility pending a hearing to determine whether he was a sexually violent predator. In February 2015, the trial court again found probable cause existed and ordered Shirley detained in a secure facility pending a hearing to determine whether he was a sexually violent predator.

In July 2019, a jury found Shirley to be a sexually violent predator within the meaning of the SVPA. The trial court ordered him committed to the DSH for an indeterminate term. Shirley appealed.

DISCUSSION

"Subject to certain limitations inapplicable to the present discussion, all relevant evidence is admissible (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d)), and relevant evidence is defined as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) . . . The trial court has considerable discretion in determining the relevance of evidence." (*People v Williams* (2008) 43 Cal.4th 584,

10

633-634.)  We review challenges to the trial court's evidentiary rulings for an abuse of discretion.  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)

I.

THE TRIAL COURT DID NOT ERR BY PRECLUDING TESTIMONY ABOUT DR. FISHER'S OTHER PATIENTS WHO LACK VOLITIONAL CONTROL.

Shirley argues the trial court erred when it prevented his expert witness Dr. Fisher from testifying as to specific instances of behavior of the expert's other patients who lacked volitional control over their sexual behavior.  We conclude the trial court did not abuse its discretion by excluding such evidence as irrelevant.  Even if the court's ruling constituted error, it would be harmless.

A.

*Pretrial Discussions of Dr. Fisher's Proposed Testimony Regarding Other Patients*

At a pretrial hearing, the prosecutor orally requested that the court preclude Dr. Fisher from providing, during his testimony, specific examples of a lack of volitional control exhibited by his other patients that Dr. Fisher cited in his report.  The prosecutor argued:

"Dr. Fisher is going to testify that Mr. Shirley does have pedophilic disorder; however, he does not find him to be a sexually violent predator because Mr. Shirley's pedophilic disorder does not give him a lack of volitional control and, therefore, does not make him predisposed to commit sexually violent crimes.

"Now, in order to make this determination, Dr. Fisher states in his report, compared to my other patients, he doesn't do these things, and therefore, he has volitional control.

"For example, . . . he said in his report, my other patients?  They get caught with child pornography all the time.  My other patients, they will draw pictures of children and, et cetera, which shows lack of volitional control.

11

"My problem with that is twofold.  Number one, relevance to Mr. Shirley.  What other people do has no relevance on what—Mr. Shirley's case.  Number two, in order for Dr. Fisher to make that testimony, it would be hearsay.  Unless Dr. Fisher can specifically say, I've caught him with child pornography, he can't testify to that."

Shirley's trial counsel argued that such testimony is relevant as the basis of Dr. Fisher's opinion that Shirley does not have an emotional or volitional impairment.

The trial court inquired of the prosecutor:  "Isn't this what all these experts do is they talk about their experience with other patients?"  The prosecutor responded: "They don't get into detail about their other patients.  They simply say, he's a sexually violent predator.  They simply say that he has—he lacks volitional control.

"He doesn't say, well, my other patients go to treatment and do the homework; he doesn't.  You see . . . all they'll testify is Mr. Shirley doesn't go to SOTP, he doesn't participate, and he gets into fights, et cetera.  They never once say, my other patients don't ever get into fights.  My other patients actually go to class and they pass SOTP.  They stick to Mr. Shirley.

"Their—her doctor's going to say, my other patients are way worse than him and, therefore, he . . . actually has volitional control, whereas they don't."

After the prosecutor and Shirley's trial counsel offered additional argument on the prosecutor's objection that the evidence in question constituted inadmissible hearsay, the hearing on this issue concluded with the trial court stating that the court was going to rely on Shirley's trial counsel's representation that she was "going to only ask relevant and admissible questions."  The court did not elaborate regarding what aspects of Dr. Fisher's proposed testimony the court deemed relevant and admissible.

## B.

*Before Dr. Fisher Testifies, the Trial Court Limits Dr. Fisher's Testimony Regarding His Other Patients' Behavior.*

Before Dr. Fisher testified at trial, the prosecutor requested that the court revisit its ruling that Dr. Fisher was precluded from "testifying as to what his other patients do." The prosecutor cited the portion of Dr. Fisher's report in which Dr. Fisher noted "other patients who exhibit pedophilic disorders such as pasting pictures of children's faces on adult pornography and masturbating to them" and referred to "patients who put pictures of children inside their underwear or draw pictures of patients or any other type of volitional lack of control such as sexually assaulting female staff."

The prosecutor stated: "The court had ruled that this was excluded based on my motion that this is irrelevant. What . . . other patients do is irrelevant as to what Mr. Shirley does in his evaluation of Mr. Shirley. And the court did rule that that was excluded."

Shirley's trial counsel stated that she had a different understanding of the court's ruling. She stated: "Dr. Fisher is going to explain to the jury what volitional impairment is and then give examples of some of the things that he's personally witnessed in regards to volitional impairment. It is foundational for his expert opinion. It's part of his training and experience. And it's highly relevant." After the trial court stated, "I don't see why it's highly relevant," the following colloquy ensued:

"[Shirley's trial counsel]: Because it's just like with any other expert that testifies. Part of their expertise is their training and their experience, and when they're explaining volitional impairment, Dr. Flinton has kind of already explained to the jury that volitional impairment can be shown because in the past when Mr. Shirley was in the community back in 2003, he molested M[.]F.

"In regards to that, Dr. Fisher's going to talk about volitional emotional impairment and explain to the jury that there is a two-prong test in regards to diagnosis

13

and whether or not it's a qualifying diagnosis. It's not just a DSM[3] diagnosis, it's also that it is current and that there's current volitional emotional impairment.

"Dr. Fisher's going to explain what he's seen in this type of community. Just like Dr. Flinton, Dr. Fisher has worked with men convicted of sex crimes, and he's going to talk about the types of volitional and emotional impairment he's seen and how that is relevant in his determination of whether or not Mr. Shirley is currently volitionally and/or emotionally impaired.

"The Court: How does that help you?

"[Shirley's trial counsel]: How does that help?

"The Court: Help you.

"[Shirley's trial counsel]: It helps me because it's his foundation as to why he says that Mr. Shirley doesn't have a current diagnosis pursuant to the SVPA. He will testify that . . . Mr. Shirley has pedophilic disorder, but pursuant to the SVPA, it's not current. And that the literature talks about how pedophilic disorder is—can be lifelong but also wanes over time and that the research shows that a lot of individuals who are nonexclusive pedophiles are less likely to offend.

"And so with all of this together, his training and experience is highly relevant in regards to these proceedings."

The court responded: "But you don't need to go into these specific acts of pasting pictures of children's faces and all that kind of stuff. That's not relevant." The court further stated, "That's not the case with Mr. Shirley." Shirley's trial counsel responded: "Correct. And that's part of the reason, based on his training and experience, that he doesn't find it a current diagnosis for Mr. Shirley."

The court ruled that Dr. Fisher could "say it's not a current diagnosis of Mr. Shirley" but "[w]e're not going into this other—what these other people do. That

---

[3] The Diagnostic and Statistical Manual of Mental Disorders, 5th edition.

14

was the ruling before. It's still the ruling." In response to Shirley's trial counsel's question, "So his experience isn't relevant?" the court stated, "No. The ruling . . . specifically goes to what . . . he's talking about here. We're not going to talk about some other person [who] sticks pictures in his pants or something. We're not doing that."

## C.

### *Dr. Fisher's Testimony Regarding Signs of a Lack of Volitional and/or Emotional Control*

During direct examination, Dr. Fisher testified that in determining whether a patient meets SVPA criteria, "one thing we're always looking for is that current, objective kind of behavioral evidence that this person still has difficulty controlling their pedophilia." After Shirley's trial counsel asked Dr. Fisher, "Is it fair to say that some of the things that you're taught to look for is photo collections of victim types?" the prosecutor objected on relevance grounds.

A further hearing was held on the scope of Dr. Fisher's testimony on this issue.[4] Shirley's trial counsel stated that the court excluded testimony regarding behavior Dr. Fisher personally observed and that counsel was intending to "only go into what they're taught to look for because it's relevant to what he looked for in regards to Mr. Shirley" on the issue of volitional and/or emotional control. The prosecutor reiterated "[w]hat other patients do, whether he heard it, whether he personally saw it, is irrelevant to Mr. Shirley."

The trial court concluded Dr. Fisher could testify about what he was taught to look for that shows a lack of volitional and/or emotional control as well as about his experience with such behaviors short of testifying about what he personally saw in specific cases not involving Shirley.

---

[4] Shirley does not mention in his appellate opening brief this sidebar conference at which the trial court clarified its ruling in Shirley's favor.

15

In the context of determining whether an individual lacked volitional and/or emotional control, Dr. Fisher thereafter testified that during his tenure at Napa State Hospital, he was taught to look for and document "self-oriented items" like photos, or drawings, or subscriptions to different magazines and "photo collections of a victim type profile." He testified he was taught to look for individuals who stalk their victim type. He stated that "there's lots of expressions of that kind of sexual interest that . . . can be exhibited in these facilities." He testified he looked for individuals who exposed themselves, who engage in sexual harassment, or commit "sexual-type assaults." He also stated that he was taught to look for individuals who remain in their bedroom behind a locked door, noting that while that does not necessarily mean something sexually deviant is happening, it should be documented. He added that behavior exploiting other lower-functioning patients or younger-looking individuals within the hospital setting could be a sign and symptom "of the manifestation of the disorder."

Dr. Fisher's direct examination on this issue continued:

"Q And in regards to that, in the five and a half years that you worked at Napa State Hospital, were these some of the behavioral manifestations that you witnessed when you worked there with sex offenders?

"A Yes.

"Q And without getting into any of the details in regards to that, when you were working with sex offenders, were you taught to specifically look for some of those earmarked issues?

"A Yeah. Definitely.

"Q Okay. And when you did the evaluation on Mr. Shirley, did you see anything within his file to indicate that those types of behavioral manifestations were happening with Mr. Shirley?

"A No. Nothing of a sexual nature. Certainly nothing of a pedophilic kind of nature."

16

Dr. Fisher testified that Shirley does not currently lack volitional or emotional control, 16 years after the qualifying conviction, and thus does not qualify as a sexually violent predator under the SVPA.

D.

*The Trial Court Did Not Abuse Its Discretion in Deeming Details Regarding Dr. Fisher's Other Patients Irrelevant; Any Abuse of Discretion Would Be Harmless.*

Shirley argues the trial court erred by ruling that Dr. Fisher "could testify that [Shirley] lacked a current diagnosis of pedophilic [dis]order, [but] could not testify as to what other persons with that disorder did." But at the sidebar conference that took place during Dr. Fisher's testimony, the trial court clarified its ruling that Dr. Fisher was permitted to testify about what he was taught to look for in individuals that shows a lack of volitional and/or emotional control as well as about his experience observing such behaviors short of testifying about what he personally saw in specific cases not involving Shirley. As discussed *ante*, during his trial testimony, Dr. Fisher identified several behaviors he was trained to look for, at least some of which he personally witnessed during his tenure at the hospital. Given Dr. Fisher's permitted testimony, the trial court did not abuse its wide discretion in concluding that evidence of specific details of Dr. Fisher's other patients' behaviors, showing a lack of volitional control, would be relevant to showing Shirley had volitional and/or emotional control.

In any event, Shirley has failed to show any error in the court's ruling was prejudicial. Dr. Fisher opined that Shirley had volitional and/or emotional control in part because Shirley did not engage in behaviors Dr. Fisher had been taught to look for, some of which he personally observed in other patients, that reflect a lack of such control. Shirley does not explain how it is reasonably probable he would have received a more favorable result had further testimony about Dr. Fisher's observations of other individuals' specific behaviors showing a lack of volitional and/or emotional control had

17

been admitted.  (*People v. Samuels* (2005) 36 Cal.4th 96, 113-114 [state law evidentiary errors tested by *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) standard of prejudice].)

II.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING DR. JENKINS TO TESTIFY REGARDING SHIRLEY'S DEMONSTRATED LACK OF CONTROL IN THE CONTEXT OF NONSEXUAL MATTERS.

Shirley contends the trial court erred by allowing Dr. Jenkins to testify about Shirley's lack of control in the context of *nonsexual* matters because lack of control is only relevant under the SVPA in the context of sexual matters.  Shirley fails to show the court erred or that any error was prejudicial.

A.

*The Trial Court Overrules Shirley's Objection to Dr. Jenkins' Testimony.*

During Shirley's trial counsel's cross-examination, Dr. Jenkins testified that four months before trial he stated he had not seen in Shirley "any volitional impairment as it relates to pedophilic disorder in the last three years."  Dr. Jenkins testified he could not say the same about emotional impairments as it relates to pedophilic disorder.  He stated he believes Shirley to be emotionally impaired.

On redirect examination, Dr. Jenkins testified:  "[W]e're not required to look at current status in terms of volitional impairment.  Volitional impairment's already been established by his repeated pattern of sex offenses against children, his own acknowledgement in the past of approximately 70 victims, there is volitional impairment.

"He knew what he was doing was wrong in 2000, at least when he was first arrested for the . . . sex offense against D[.], and he continued to offend [in] 2001 and 2003.  That's volitional impairment,

"Furthermore, volitional impairment, just because [his disorder] waxes and wanes or doesn't occur within a specific amount of time doesn't mean volitional impairment is no longer present.

18

"For example, I, in my evaluations, can find someone no longer meets the criteria as a sexually violent predator but they do have a pedophilic disorder and they do have—are volitionally impaired and emotionally impaired, but they don't meet that— third criteria. They can be safely and effectively treated in the community.

"So volitional impairment is episodic, it can be based on opportunity. . . . Mr. Shirley hasn't had opportunity in the time he's been in custody since around 2010." Dr. Jenkins clarified that the lack of opportunity he referred to related to Shirley not having had access to children during that time.

The prosecutor then asked Dr. Jenkins, "Since the last three years, has there been any indication that Mr. Shirley lacks volitional control, period?" Shirley's trial counsel objected on the grounds of relevance and the court held a sidebar conference. Shirley's trial counsel argued the relevant issue is whether Shirley is "currently volitionally or emotionally impaired" *because of* his pedophilic disorder and whether he has control issues in a nonsexual context is irrelevant.

The trial court asked the prosecutor why he would not ask his question relating to volitional and emotional control in the context of sexual matters. The prosecutor responded: "As the doctor's indicating, he's got no opportunity in the hospital to show lack of volitional control. So my question is going to be, does he show indications of lack of volitional control? Yes. So logic will say if he is presented with an opportunity, guess what? He won't have volitional control there either."

The court ruled that the prosecutor "gets to ask the way he wants to" and Shirley's trial counsel "can cure it on cross."

Dr. Jenkins thereafter testified Shirley "lacks volitional control based on his pattern of behavior, his repeated offenses. He lacks emotional control because he does not truly, deeply appreciate [the] consequences of his actions, the impact." He further testified that what is missing is the opportunity for Shirley to be around a child.

19

B.

*The Trial Court's Ruling Did Not Constitute Prejudicial Error.*

In his testimony, Dr. Jenkins at least implied there was no direct evidence of Shirley's current (within the prior three years) lack of volitional or emotional control with regard to his pedophilic disorder. That testimony was corroborated by Dr. Fisher's testimony that Shirley had not been recently observed engaging in behaviors that typically reflect a lack of volitional and/or emotional control in the context of sexual matters.

In the face of no such direct evidence, the trial court ruled that Dr. Jenkins could testify about Shirley's lack of volitional control generally, subject to cross-examination. Shirley does not cite testimony after that ruling where Dr. Jenkins testified about Shirley's lack volitional control specifically outside of sexual matters. Instead, Dr. Jenkins testified that in his opinion, Shirley currently lacked volitional control as evidenced by "his pattern of behavior, his repeated offenses" and lacked emotional control because "he does not truly, deeply appreciate [the] consequences of his actions, the impact." He further testified that Shirley told Dr. Jenkins in 2018 that he had "some appreciation, but . . . he doesn't follow through with that . . . because of his lack of participation . . . or really good participation in treatment." In other words, notwithstanding the court's ruling allowing the prosecution to inquire at least generally about Shirley's lack of volitional control in nonsexual matters, it appears Dr. Jenkins ultimately based his opinion Shirley lacks volitional and emotional control on Shirley's prior *sexual* behavior and attitudes toward it.

In any event, even if we were to construe Dr. Jenkins's testimony to relate to nonsexual matters and also find the trial court's ruling to permit that testimony as constituting an abuse of discretion, any error was harmless in light of the given jury instructions.

20

The jury was instructed on initial commitment as a sexually violent predator with CALCRIM No. 3454 modified to state in part as follows: "The petition alleges that Dwayne Shirley is a sexually violent predator.

"To prove this allegation, the People must prove beyond a reasonable doubt that:

"1. He has been convicted of committing sexually violent offenses against one or more victims;

"2. He has a diagnosed mental disorder;

"3. As a result of that diagnosed mental disorder, he is a danger to the health and safety of others because it is likely that he will engage in sexually violent predatory criminal behavior;

"AND

"4. It is necessary to keep him in custody in a secure facility to ensure the health and safety of others.

"The term *diagnosed mental disorder* includes conditions either existing at birth or acquired after birth that affect a person's ability to control emotions and behavior and predispose that person to commit criminal sexual acts to an extent that makes him or her a menace to the health and safety of others.

"A person is *likely to engage in sexually violent predatory criminal behavior* if there is a substantial danger, that is, a serious, and well-founded risk that the person will engage in such conduct if released into the community."

That instruction also stated: "You may not conclude that Dwayne Shirley is a sexually violent predator based solely on his alleged prior conviction without additional evidence that he *currently* has such a diagnosed mental disorder." (Italics added.)[5]

_____

[5] That instruction concluded: "In order to prove that Dwayne Shirley is a danger to the health and safety of others, the People do not need to prove a recent overt act committed

21

We presume the jury followed the trial court's instructions that before finding Shirley to be a sexually violent predator, it must find that *as a result of his pedophilic disorder* and not a general impulse control problem, it is likely that he will engage in sexually violent predatory criminal behavior. (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Therefore, any error admitting the above quoted brief statements by Dr. Jenkins regarding Shirley's lack of volitional and/or emotional control was harmless.

## III.

### CUMULATIVE ERROR

Shirley asserts cumulative error. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors." (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216.)

We have rejected both of Shirley's contentions of evidentiary error for the reasons set forth *ante*. Therefore, there was no cumulative error.

Even if his contentions of error had merit, it was not reasonably probable Shirley would have obtained a more favorable result in their absence. (*People v. Samuels, supra*, 36 Cal.4th 96 at pp. 113-114 [state law evidentiary errors tested by *Watson* standard of prejudice].)

---

while he was in custody. A *recent overt act* is a criminal act that shows a likelihood that the actor may engage in sexually violent predatory criminal behavior."

## DISPOSITION

The order of commitment is affirmed.


                                              FYBEL, J.

WE CONCUR:


_____

MOORE, ACTING P. J.


THOMPSON, J.