Filed 5/26/21  P. v. Mejia CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NOE MEJIA,<br><br>    Defendant and Appellant. | H046662<br>(Santa Clara County<br>Super. Ct. No. C1641926) |

A jury convicted appellant Noe Mejia of inflicting corporal injury on a partner while having a prior conviction for the same crime within seven years (count 2) and misdemeanor assault (count 1).  The trial court sentenced Mejia to eight years in prison.

On appeal, Mejia claims the trial court erred by failing to instruct sua sponte on the defense of property for count 2 and, alternatively, his defense counsel performed ineffectively by failing to request such an instruction.  Mejia further contends the trial court erred by failing to instruct sua sponte on unanimity for count 2 and, alternatively, his defense counsel performed ineffectively by failing to request such an instruction.  Mejia also contends that the cumulative effect of the trial court's alleged instructional errors was prejudicial.  In addition, Mejia claims his conviction on count 1 for assault is

barred by double jeopardy protections because simple assault is a lesser-included offense of count 2.[1]

For the reasons explained below, we affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In September 2017, the Santa Clara County District Attorney filed a first amended information (information) charging Mejia with assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4);[2] count 1), infliction of corporal injury on a partner with a prior conviction within seven years (§ 273.5, subds. (a), (f)(1); count 2), criminal threats (§ 422; count 3), and dissuasion of a witness by force or threat (§ 136.1, subd. (c)(1); count 4).[3]  As to counts 1 and 2, the information alleged that Mejia had inflicted great bodily injury (§§ 12022.7, subd. (e), 1203, subd. (e)(3)).  The information also alleged that Mejia had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12) and two prior serious or violent felony convictions (§ 667, subd. (a)), and had served a prior prison term (prison prior) (§ 667.5, subd. (b)).

In March 2018, the jury found Mejia guilty of count 2 and the lesser-included offense of simple assault for count 1.  The jury acquitted Mejia of counts 3 and 4.  As to count 2, the jury found true that Mejia had suffered a prior conviction for a violation of section 273.5, subdivision (a), in the preceding seven years.  But the jury found not true

---

[1] In his opening brief, Mejia also claims that Penal Code section 654 applies to counts 1 and 2 and, thus, his punishment on count 1 should be stayed.  However, in his reply brief, Mejia agrees with the Attorney General that his claim is moot because he has already served his misdemeanor sentence for count 1.  We accept Mejia's concession and will not further address his Penal Code section 654 claim.

[2] Unspecified statutory references are to the Penal Code.

[3] The same person is the alleged victim in all counts of the information.  To protect the victim's privacy, we will refer to her as Sophia S. or Sophia.  (Cal. Rules of Court, rule 8.90(b)(4).)

the allegation that Mejia inflicted great bodily injury on the victim under section 12022.7, subdivision (e).

In July 2018, following a court trial, the trial court found true the two prior strike allegations and the prison prior allegation.

In January 2019, the trial court denied Mejia's motion for new trial and motion to dismiss the prior strikes. The court sentenced Mejia to eight years in prison on count 2. On count 1, the court imposed 120 days in county jail and deemed that sentence served. The court struck the one-year prison prior enhancement (§ 667.5, subd. (b)) in the interest of justice (§ 1385).

B. *Evidence Presented at Trial*

1. <u>Prosecution Evidence</u>

Mejia and Sophia S. had dated off and on for about three and one-half years before June 19, 2016.[4] Their final dating period lasted from around the end of March/beginning of April until June 19—Father's Day.

On the morning of June 19, Mejia and Sophia went to a car dealership, where Mejia purchased a car for them to share. Sophia also smoked methamphetamine alone that morning. That afternoon, Mejia and Sophia spent time at Sophia's apartment in San Jose. Mejia left the apartment for two or three hours to visit his son and returned about 6:30 or 7:00 p.m. When Mejia came back, he was upset because he had not been able to see his son. Mejia and Sophia argued, and Sophia left her bedroom to "give [Mejia] his space because he was upset" and call her children to say goodnight.

Later, Sophia entered the bedroom to get some things from her dresser before taking a shower. Mejia punched Sophia in her nose with a closed fist. Sophia, who was bleeding, fell to the floor and covered her nose. Mejia hit and punched Sophia some more and kicked her in the face. Mejia picked Sophia up off the floor by grabbing her

---

[4] Unless otherwise indicated, all dates occurred in 2016.

neck. Mejia then pushed Sophia back to the floor, got on top of her, and choked her with both of his hands. Sophia could not breathe; she believed she "passed out" because her "vision went black and her body felt warm." Mejia then picked Sophia up by her hair and took her into the kitchen, where he strangled her. She told Mejia to stop and said that she loved him. She also asked him why he was "doing this." Mejia called Sophia a dog and a "fucking bitch." He threatened to kill her a couple of times. Sophia believed she was going to die.

After Mejia stopped strangling Sophia, she ran out of the apartment and down a hallway. Mejia ran after her, grabbed her by her hair, and began pulling her back to the apartment. He also punched her in the head more than once. Mejia told Sophia that the police had been called and urged that they return to the apartment. Mejia held Sophia up and began walking her back to the apartment.

At that point, about 11:00 p.m., San Jose Police Department Officer Jason Wellman and his field training officer arrived at the apartment building. Wellman saw Mejia and Sophia standing next to each other in the hallway outside of Sophia's second-floor apartment. Sophia was crying; she appeared "frightened" and "a little bit shaken up." According to Sophia, Mejia told the officers he "found her like this." The officers separated Mejia and Sophia, and Wellman detained Mejia in handcuffs. Wellman observed "some fresh wounds" on Mejia's right knuckles. Mejia said the injury was an old one that had reopened; he had previously sustained the injury at work. Mejia was "[r]elatively calm" and did not appear under the influence of methamphetamine.

Officer Wellman also spoke with Sophia. Wellman observed bruising and swelling on Sophia's face and neck. Further, when being cross-examined about his report on the incident, Wellman said that he had noticed bruising on Sophia's left wrist. Wellman testified that he did not recall seeing blood around Sophia's face or coming from her nose. In his report, Wellman characterized the injuries he had observed as

4

"apparent minor injuries." To Wellman, Sophia did not appear to be under the influence of methamphetamine.

Sophia told Officer Wellman that Mejia had been drinking and was upset because he had not been able to see his son that day. Sophia reported having been punched and kicked in the face and described "passing out." She also said that, while in the hallway with Mejia, he had threatened to kill her by throwing her down a flight of stairs. Wellman offered Sophia an emergency protective order, which she accepted. Wellman also summoned emergency medical personnel. Sophia was transported to the hospital for treatment. Thereafter, Sophia had two black eyes and bruises on her face and neck. She also had bled from her nose and mouth as a result of the beating. Sophia said that, to her knowledge, her nose had never been broken prior to this incident.

In addition to testifying about the incident with Mejia on June 19, Sophia testified about an accusation of domestic abuse that she had subsequently made in September 2016 against Eli Casas.[5] At a preliminary hearing stemming from her accusation against Casas, Sophia testified that she (not Casas) had caused her injuries. At the time of her testimony, Sophia believed a baby she had had recently was Casas's child.

At the time of Mejia's trial in 2018, Sophia was married to Casas, but they were "not together." Sophia admitted lying to police about Casas and to having previously told Casas that she had reported "bullshit" to the police about him having hurt her. She also acknowledged having written a letter to the district attorney's office that said she had not been truthful about the incident with Casas.[6]

On cross-examination, Sophia testified that she had an "on-and-off relationship" with Casas for the preceding four years. On a day in September 2016, she and Casas

---

[5] The district attorney provided Sophia use immunity for her testimony at Mejia's trial about the Casas matter.

[6] At the close of the prosecution's rebuttal case, the trial court took judicial notice (before the jury) of Eli Casas's no-contest plea, on February 26, 2018, to a felony violation of section 273.5 against Sophia. (Evid. Code, § 452)

argued, and she slapped him a couple of times. Casas did not hit or touch her. Sophia explained that she scratched herself and "probably" threw herself to the ground in a tantrum, causing injury to herself. After that incident, Sophia told the police that Casas slapped, strangled her, and pushed her onto a bed and to the floor, causing injury to her knee. Sophia lied because she was high on methamphetamine and upset about harassment by the mother of Casas's child.[7] Sophia similarly lied to hospital personnel about the incident with Casas. She admitted lying multiple times while testifying at Casas's preliminary hearing.

In addition to providing her own letter to the district attorney's office, Sophia gave the district attorney letters from other people about the Casas incident (including a letter from Leon Esquenazi, which Sophia denied writing or reading) and Casas's employment information. She provided this material to the district attorney to help free Casas from jail. Sophia also spoke to and wrote a letter to an inmate named Michael Ochoa, whom she knew through Casas and whom Casas said was "pretty much family."

Richard Ferry, a licensed marriage and family therapist, testified as an expert in intimate partner violence and domestic violence. Ferry explained the characteristics and effects of intimate partner violence, including that a victim of intimate partner violence may react differently to different abusive partners for various reasons. Further, victims may use drugs or alcohol to self-medicate ("stay numb") or show loyalty to the abuser. Victims commonly recant their previous statements about abuse because of fear of retaliation, "continuing lingering attachment to the abuser," and/or self-blame. Even when the abuser enters custody, he may be able to continue exerting control over the victim and influencing her to recant her narrative. The possibility of recantation is

---

[7] Sophia testified that methamphetamine "[j]ust keeps you up," and denied that it caused her to hallucinate or become agitated, violent, or "[c]razy." However, in a recorded call with Casas, she had agreed that when she is under the influence of methamphetamine, she "get[s] crazy."

6

greater where the victim and abuser share children or the victim is pregnant with the abuser's child.

Ferry explained the three stages of the "cycle theory of violence" that characterizes intimate partner battering: the tension-building phase, the acute violence phase, and the reconciliation phase. Ferry opined that abusive males often use strangulation not to kill, but rather to show that they can kill. And then they use that awareness as leverage in later coercive situations.

Ferry considered hypothetical scenarios that mirrored the facts presented to the jury about the incidents involving Sophia, Mejia, and Casas, as well as Sophia's recantation. Ferry opined that the hypothetical woman's behaviors in the stated scenario were consistent with a woman who had experienced intimate partner violence. Ferry stated further that a woman losing interest in a romantic relationship and nevertheless maintaining her recantation would be unusual, but her decision could be affected by "the potential bind of a child" or other factors not disclosed in the hypothetical.

The trial court admitted a certified record of Mejia's prior conviction for a violation of section 273.5.

### 2. Defense Evidence

Michael Ochoa testified that he became friends with Eli Casas while incarcerated at the county jail between the end of 2016 and November 8, 2017. Ochoa also befriended and communicated with Sophia by telephone and letters. Ochoa did not have a relationship with Mejia prior to October 2017, when Ochoa contacted Mejia in jail and provided him information and letters that Ochoa had received from Casas and Sophia.

At some point while they were in jail together, Casas asked Ochoa to falsely state that he (Ochoa) had overheard Mejia threaten Sophia "not to show up in court" and say

7

"If he ever got out, it will be all bad."[8]  Additionally, in a letter to Ochoa, Casas wrote that he would "send[] investigators to talk to [Ochoa]" so he could relay Mejia's supposed threat to them.  Sophia also had told Ochoa once over the phone "to be ready, that [the investigators] were going to be coming to see [him] soon."  And, in a letter that Sophia had sent to Ochoa, she wrote, " 'As for that bitch, [Mejia], fuck him and everything.' "

Ochoa testified that he had initially considered doing what Casas had requested.  However, after Ochoa's mother died in September 2017, and after Ochoa started "doing the spiritual thing," he decided not to assist Casas.  Instead, Ochoa relayed the information and letters he had received from Casas and Sophia to Mejia.

Mejia testified in his own defense.  Mejia acknowledged that he had previously been convicted for domestic violence in 2011.[9]

Mejia testified that, around 2006 or 2007, Sophia's uncle, Mejia's "business friend," had asked Mejia to look after his 15-year-old niece Sophia (who was then pregnant) and other nieces and nephews while the uncle served a sentence in county jail.  Later, in 2012 or 2013, Mejia and Sophia began dating.  Mejia broke up with Sophia around late 2013 due to "her lifestyle choices."

In 2016, Mejia and Sophia resumed a relationship after Sophia's sister told Mejia that "Sophia was in a really bad place."  The sister was scared Sophia "was going to hurt herself" and felt that Mejia "could intervene and help Sophia out."  Mejia got back in touch with Sophia.

---

[8] On cross-examination, Ochoa admitted previously telling Mejia's investigator that Casas had asked him to say that Mejia said, " 'Tell that bitch she better not testify. She better change her story to the DA.' "

[9] In that prior prosecution, Mejia had proceeded to trial, but, after the victim testified, Mejia pleaded no contest to violations of sections 273.5 and 245, subdivision (a)(4), and admitted allegations regarding personal infliction of great bodily injury.

Around May, Mejia discovered that Sophia had installed "spy ware" on his cell phone to monitor his text messages. Mejia told Sophia that he had been communicating with a former girlfriend and with Sophia's sister. Mejia and Sophia spoke about and "resolved the issue," and Sophia "moved forward from there."

By June, Mejia was staying over at Sophia's apartment three or four times per week. Their dating relationship was not exclusive. Mejia felt he played a "role of protector" for Sophia and he "was trying to help her out and have her change her life." At that time, Sophia had two children who were living with their father, whom Sophia had said "physically assaulted her, almost killed her, stomped her out," and broke her nose.

On June 19 (the date of the incident), Mejia purchased a used Mercedes Benz while accompanied by Sophia. After buying the car, Mejia dropped Sophia off at her apartment. He then picked up his father so they could go see Mejia's son. Mejia and his father visited with Mejia's son, but only for about an hour because the boy's mother had made other plans. This made Mejia a "little sad," but not mad. Mejia then returned to Sophia's apartment earlier than he had originally anticipated. Upon his return, Mejia let Sophia know that he had not been able to take his son out to a children's arcade and restaurant as he had planned. Mejia observed that Sophia was "very talkative," "pacing around the apartment, going through cabinets," and "listing the name of things that [they] need[ed] around the house." Mejia told Sophia he did not have money, but he was "not really responding too much to her." Sophia became upset and said, "Don't blame it on me because your baby's mommy is being a bitch." Mejia "wasn't in the mood" to talk to Sophia and "really didn't want to hear it." Mejia "knew" Sophia wanted money. Mejia told Sophia that he did not have any money and continued to "block[] her out." Mejia eventually left the apartment for a short time to pick up some food.

When he returned, Mejia sat down in the living room to eat his dinner. He was relaxed and calm. Mejia eventually noticed that Sophia was in the bathroom. Mejia ate

9

and drank a beer. After about 30 to 45 minutes, Mejia knocked on the bathroom door. He asked Sophia what she was doing and told her to open the door. He suspected she was using methamphetamine. Eventually, Sophia opened the door and told Mejia he was being "fricking nosey." Mejia observed "thick" "smoke clouds, meth clouds" in the bathroom. Mejia accused Sophia of "smoking dope" and asked her why she was using again—after having promised three days earlier to get clean. Sophia eventually admitted to smoking drugs. Sophia said, "I was trying to get clean, but you f'd my friend, Tess." Mejia denied sleeping with Sophia's friend, but Sophia continued to accuse him of having sex with Tess. Sophia also raised a question about Mejia having had sex with her sister and mentioned Mejia's communications with his former girlfriend.[10]

Sophia became "more erratic" and was slamming things in the kitchen. Sophia again accused Mejia of having sex with her best friend at the apartment, even though Sophia allowed Mejia to stay there without contributing to the bills. Mejia responded by saying that he had given money to Sophia "here and there" when he could, but he could not give her more money because he was "broke right now." He also questioned why Sophia needed money because she was receiving housing assistance and welfare payments.

Sophia grabbed Mejia's wallet from the kitchen counter, looked in it, and did not find any cash. She said, "that's okay, because I know your pin, sweetheart." Sophia grabbed Mejia's keys from the counter and made her way to the door. Mejia "became alarmed." He said, "where you going? You're not going to leave with my keys, you're not going to leave with my wallet. Give me my stuff back." Sophia then "turned on"

---

[10] Mejia testified that he did not have "any sort of relationship with" Sophia's friend Tess at the time of the incident and he was just friends with Sophia's sister. He explained that Tess had once shown up at the apartment, sat down next to him, "was on" him, and "things went, kind of far, but not all the way," because "after the touching" Mejia "stopped it" and "told her, we're not going to do this," and "she left the apartment."

Mejia. Sophia said "you f'd Tess, you slept with my sister. You're a cheating bastard. I hate you." Mejia responded, "Just give me my stuff and I'm going to leave. We're done."

Sophia struck Mejia. He testified he had "blocked it. It caught [him] on [his] shoulder, on the side of [his] head." Sophia struck Mejia "probably, three or four times," with a closed right fist. Mejia backed away from Sophia and told her to "calm down" because she was "going to get the cops sent." Sophia yelled, "I hope they do come. Send you to prison. You're such a bastard." Mejia responded, "just give me my keys, just give me my car. I'll leave. I'm done with you. I don't have to be here. I don't want to be here no more. I'm done."

Sophia again raised the issue of money and said Mejia was "going to pay her," because "things cost around []here" and he was "not just going to use her and leave her." Mejia told Sophia he would pay her. He asked for his wallet and keys so he could go get money for her. Sophia refused. Mejia then attempted to grab his wallet from Sophia's hand. Sophia began "swinging" at Mejia; he held out a hand to block her. At some point, as Sophia was "rushing at" Mejia, he "end[ed] up pushing her back, and [] hold[ing] her back against the door, restraining her against the door." Sophia continued "flailing" and "throwing blows." When Sophia "came at [Mejia] with force," his left hand "end[ed] up going around her [neck] area." Mejia then released Sophia and asked for his things again. Sophia got "really upset" about Mejia putting his hands on her. Sophia said "you're done, you're done. And she came at [him] again."

Sophia tried to scratch Mejia. She was "swiping" at him with her right hand and "hitting" him with her left hand. Mejia grabbed Sophia again and pushed and held her against the door; he told her not to scratch him. While Sophia was swinging at Mejia, his wallet flew out of her hand. Mejia testified that he did not hit Sophia's head or face with his closed fist; nor did he otherwise strike her face.

11

Mejia stepped back and told Sophia to calm down.  Mejia testified that he then did the following: "I go and I grab my wallet and I pick it up off the ground.  And when I turned to pick it up off the ground I hear the front door open."[11]  Sophia opened the door and started running out with his keys.  Mejia yelled that she was not going to take his car and "said, hey, give me my keys."  Mejia ran to Sophia "to prevent her from leaving with [his] keys.  And she ends up whipping around to exit the apartment, and she bumps a little bit into the door frame of the door. . . . and runs out into the hallway."

Mejia ran into the hallway and continued to tell Sophia to give him his keys back.  Sophia took "another swipe" at Mejia and tried to run around him.  Mejia grabbed Sophia's left wrist.  Sophia was "yanking, trying to disentangle, herself from [Mejia], trying to break [his] grip, but [he] ha[d] a good grip of her hand."  Mejia told Sophia to give him his keys and that he was going to leave.  Sophia yanked her hand again and cried out about being in pain.  She sat down, complained about pain in her wrist, and dropped Mejia's keys.  Mejia picked up his keys and asked Sophia if she was all right.  Sophia said Mejia had broken her wrist, but she would not show it to him.  The police arrived soon after.

Mejia denied threatening to kill Sophia or threatening that something would happen to her if she called the police.  Mejia testified that he was not "a hundred percent sure" how Sophia incurred the bruising to the right side of her neck and jaw, but "it was probably during when [he] was restraining her, trying to keep her off [him] with [his] hands."  He also testified that he did not know how Sophia received bruising to her right eye.  Mejia said he did not recall ever touching Sophia's face or nose.  He also denied hitting Sophia in the face or head with his fist, knocking her down, kicking her in the face or head, pulling her hair and dragging her around the apartment, or choking her.  Mejia described Sophia's demeanor and actions toward him as "[d]eranged."

---

[11] On cross-examination, Mejia testified he, in fact, "didn't pick [his] wallet up."

12

Following the incident, the police took a picture of Mejia's hand, which had a serious cut on two of the fingers. Mejia explained that he had incurred that injury during a work-related accident three to five days earlier. He did not seek medical attention or report the accident because his construction-work environment was "macho" and he was supposed to wear gloves but was not wearing them at the time of the accident.

On cross-examination, Mejia testified that he did not notice any bruises or scratches on his body after the incident with Sophia, even though he had been wearing a tank top. In addition, he did not report any injuries to police. Mejia explained, "Every blow that she threw, I blocked, or it hit me on the shoulders or my upper chest. And when she tried to scratch me, I didn't allow her to scratch me." Mejia said Sophia's attack on him lasted "30 seconds, very brief, less than a minute." As for Sophia's injuries, he explained that Sophia "was swinging her arms, flailing. I don't know, it happened so fast. I don't know if she hit herself. The bruises, that is from me attempting to restrain her. . . . I can't explain how she injured her nose."

Mejia acknowledged that he did not tell the police on the night of the incident any of what he had testified to at trial. Instead, he lied to the police about what had happened. Mejia explained that he lied to protect Sophia, not himself. He had "loyalty to her" and "didn't want her to get in trouble []. for being on meth." He was not in love with Sophia at that time, but he yelled out that he loved her when the police had them separated in the hallway outside the apartment.

In addition to presenting the testimony of Ochoa and Mejia, Mejia's defense counsel read to the jury prior testimony of Leon Esquenazi, a witness who was not currently available to testify before the jury. In that prior testimony, Esquenazi said he had prepared a letter for Eli Casas related to Casas's then-pending domestic violence case. The letter was based on what Esquenazi had witnessed happen between Casas and Sophia. On cross-examination by the prosecutor, Esquenazi said Sophia had written the letter for him because he had bad handwriting; he subsequently signed it. He testified, "I

13

was speaking and they were writing it for me." In the letter, Esquenazi described Sophia arguing with and yelling at Casas, hurting herself, and "throwing a tantrum." Esquenazi also heard Sophia slap Casas, but that was not described in the letter. On redirect examination by defense counsel, Esquenazi said the letter was based on his own information, "word for word," and he "wrote it in [his] words first" but it was unreadable. Esquenazi said he witnessed Sophia "throw herself on the ground causing her own injuries."

### 3. Prosecution Rebuttal

Officer Wellman testified that, on the date of the incident between Mejia and Sophia (June 19), he separated them outside the apartment in accord with usual practice for domestic violence investigations. Though he detained Mejia "around the corner" from Sophia, Mejia yelled out to Sophia and peered toward her. Wellman pulled Mejia back so he could not see Sophia, and Mejia yelled again. Wellman did not recall taking a wallet from Mejia after detaining him or seeing a wallet in the apartment building's hallway. Further, a booking sheet for Mejia did not indicate that Mejia had a wallet when he was booked into jail.

## II. DISCUSSION

Mejia claims: (1) the trial court erred by failing to instruct sua sponte on the affirmative defense of defense of property for count 2; (2) alternatively, his defense counsel performed ineffectively by failing to request an instruction on defense of property; (3) the trial court erred by failing to instruct sua sponte on unanimity for count 2; (4) alternatively, his defense counsel performed ineffectively by failing to request a unanimity instruction; (5) the cumulative effect of the trial court's instructional errors was prejudicial; and (6) the conviction for misdemeanor assault on count 1 is barred by double jeopardy protections because simple assault is a lesser-included offense of count 2.

14

We address Mejia's claims in turn, grouping the two alternative ineffective assistance claims with the related claims of instructional error.

A. *Defense of Property Instruction*

Mejia contends the trial court erred by not instructing the jury sua sponte on the defense of property for count 2. Alternatively, Mejia asserts that, if this court concludes he forfeited his claim concerning the defense of property instruction, his defense counsel performed ineffectively by failing to request the instruction. The Attorney General responds that, regardless whether substantial evidence supported the defense of property instruction, any error in failing to instruct the jury on that defense did not prejudice Mejia. Further, the Attorney General asserts that Mejia fails to demonstrate his defense counsel performed deficiently or that he was prejudiced by defense counsel's performance.

1. Additional Background

As relevant here, the information charged Mejia in count 1 with assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)) and in count 2 with infliction of corporal injury with a specified prior conviction within seven years (§ 273.5, subds. (a), (f)(1)). As to both counts, the information also alleged personal infliction of great bodily injury (§§ 12022.7, subd. (e), 1203, subd. (e)(3)).

During trial, the trial court and parties discussed the proposed jury instructions. Mejia requested instructions on lesser-included offenses for counts 1 and 2, self-defense, and "fabrication of evidence." Mejia did not request a defense of property instruction.

The trial court subsequently included in its final instructions those that Mejia had requested. More specifically, the court instructed on simple assault (§ 240), as a lesser-included offense for counts 1 and 2, and battery (§ 243(e)(1)), as a lesser included offense to count 2. In addition, regarding unanimity for count 1, the court instructed, "You must not find the defendant guilty of assault by means of force likely to produce great bodily injury, as alleged in Count One, unless you all agree that the People have proved,

15

specifically, that the defendant committed that offense by acts of choking." The unanimity instruction also addressed counts 3 and 4 but not count 2. Mejia did not request an instruction on unanimity for count 2.

In his closing argument, the prosecutor explained that count 1 was "for any act of choking" Sophia and, further, the attendant great bodily injury enhancement applied "to the notion that she passed out, or in medical terms, lost consciousness." On the other hand, the prosecutor described count 2 as applying to the following: "[A]nything that is not choking is a separate thing. Specifically, it's going to be to Count Two."

The prosecutor argued further for count 2: "Very similar to the first count, in that the issue is going to come down to Sophia versus a felon. It's going to come down to, what do you believe happened in that apartment. This is for everything that happened that is not choking. So it's hits, it's kick, it's hair pulling, as long as it results in a traumatic condition. . . . [¶] So as depicted in [a photographic exhibit], . . . it is the bruises to her neck. It is the scrapes. It is the swelling that's been described -- not just by her and in the medical records and by Officer Wellman, but by [Mejia], himself, when he looks at these photos. [¶] But in this, in this, as well, there is an allegation that he, in fact, personally inflicted great bodily injury upon her. Now, again, it has to be more than [] minor or moderate harm. [¶] So a traumatic condition can be minor. Personally inflicting great bodily injury has got to be greater than minor or moderate harm. And I told you in the opening statement, this is for breaking her nose. . . . [Y]ou have medical records." The prosecutor also reiterated: "The personal infliction of great bodily injury only applies to the broken nose. For the charge, itself, . . . it is any of the injuries depicted. Any wound or other bodily [in]jury. Again, we know from Sophia what happened."

In addition, when discussing self-defense, the prosecutor argued: "Future harm is not enough. It has to be imminent. And it's not defense of property. It's defense of self. So it's not, oh, I'm worried about what's going to happen to my new Benz. It's about

16

what's going to physically happen to me. There are no clues to self-defense in the victim's testimony. There is an absolute absence of clues in Officer Wellman's testimony, when you think about [Mejia's] demeanor . . ., [his] statement . . ., and [his] physical condition." The prosecutor asserted further that "there's no evidence to back [self-defense] up, at all, other than [Mejia's] words."

The prosecutor argued further: "[Mejia] is making a claim that somehow, in his self-defense, when he is not hurt, at all, she ends up with a broken nose, . . . big bruises on her neck . . . swollen eye. She's got all these other injuries that everyone has detailed. And he, of course, has nothing." The prosecutor emphasized the unbelievability of Mejia's self-defense claim: "[T]he evidence shows[] [Sophia] suffered injuries that could not possibly have been [caused] in a self-defense case. And we know he didn't advance that with the police at first. He tried to claim she was beaten up by someone else. And the medical records show a broken nose, and abrasions of cuts [*sic*] and swelling that are far more than this 30 seconds of Mr. Mejia restraining her and her flailing around."

Mejia's defense counsel argued that the case was about "one word against another word," i.e. Sophia's version of events versus Mejia's. Counsel maintained that the jury had to have "an abiding conviction to the truth of the testimony of Sophia . . . to convict Mejia." Counsel attacked Sophia's credibility extensively, including based on her behavior while testifying, her personal interest in the outcome, the inconsistencies between her current testimony and her earlier statements to Officer Wellman and the documentation regarding her injuries, and the evidence of her pattern of deceit and perjury. Counsel asked the jurors, "Can you have an abiding conviction about someone's testimony when . . . there's 89 different stories about a couple different events? No, you can't." Counsel also juxtaposed Sophia's failure to provide a reason for Mejia attacking her with Mejia's "pretty detailed account of how everything unfolded."

Regarding self-defense, defense counsel suggested that "the lesser included offense of battery could come" into play if the jurors believed Mejia "maybe [] used a

17

little too much force . . . at some point, and it's unclear what caused what injuries." Counsel reminded the jurors of the prosecution's burden to prove Mejia did not act in self-defense and urged the jurors to "view" Mejia's testimony "with binoculars of an abiding conviction." Counsel contrasted Sophia's and Mejia's testimony and argued Mejia provided "credible details of an argument and assaultive behavior, by which he reasonably defends."

Defense counsel argued further that Officer Wellman was mistaken about Mejia's knuckle wounds being fresh. Counsel also questioned Sophia's injuries and maintained that Sophia's injuries were minor and consistent with Mejia's testimony, not her own. In particular, counsel noted Sophia's denial of a loss of consciousness documented in the ambulance records. Regarding the injury to Sophia's nose, counsel asserted there was reasonable doubt because the hospital records were "unclear . . . [on] whether this is an old fractured nose or an acute fractured nose."

Defense counsel concluded his argument, "Considering the overall testimony, demeanor and manipulative actions, I suggest that the only reasonable verdict is not guilty. There's just a lack of quality of evidence in this case. And as the law says, unless the evidence proves the defendant is guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

In rebuttal, the prosecutor argued, among other things, that the hospital records established Sophia had a nasal fracture, bleeding in her nostrils, and " 'nasal tenderness and swelling.' " The prosecutor questioned how Sophia could have incurred such an injury under Mejia's version of the altercation. The prosecutor asserted that Mejia first punched Sophia in the bedroom because she had said "[w]hat did you say" to a "man upset about not seeing his kid enough." The prosecutor concluded his rebuttal argument stating that Mejia had lied to the police and subsequently lied to the jury: "Why did he feel the need to lie to you? Because the pictures can't be overcome. [Sophia] didn't walk into his hands or run into his hands and cause the giant bruise on her neck, or the broken

18

nose, or the black eye, or the swelling to the face, or any of the cuts and stuff you see, or the bleeding in her nose. None of that fits."

### 2. Legal Principles

A trial court has a sua sponte duty to instruct regarding an affirmative defense that is not inconsistent with the defendant's theory of the case if substantial evidence supports the defense. (*People v. Salas* (2006) 37 Cal.4th 967, 982 (*Salas*).) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*Ibid.*) Doubts whether evidence is sufficient to warrant an instruction on a particular defense theory should be resolved in the defendant's favor, but the trial court need not give the instruction where the supporting evidence is insubstantial. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145.) On appeal, the appellate court independently reviews whether the trial court erred by failing to instruct on a defense. (See *People v. Simon* (2016) 1 Cal.5th 98, 133; *People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

Defense of property is codified in Civil Code section 50, which states in relevant part, "Any necessary force may be used to protect from wrongful injury the person or property of oneself." The corresponding criminal jury instruction for that defense is CALCRIM No. 3476.[12]

---

[12] CALCRIM No. 3476 provides: "The owner [or possessor] of (real/ [or] personal) property may use reasonable force to protect that property from imminent harm. [A person may also use reasonable force to protect the property of a (family member/guest/master/servant/ward) from immediate harm.] [¶] *Reasonable force* means the amount of force that a reasonable person in the same situation would believe is necessary to protect the property from imminent harm. [¶] When deciding whether the defendant used reasonable force, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [¶] The People have the

Regarding the standard of prejudice that we must apply to an erroneous failure to instruct on the defense of property, the California Supreme Court has not spoken on that question or more generally on the prejudice standard for a failure to instruct on an affirmative defense. (*Salas*, *supra*, 37 Cal.4th at p. 984.) The potentially applicable standards are: the test of *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), which applies to federal constitutional error; or the test of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), which applies to state law error. (*Salas*, at p. 984.) California Courts of Appeal have concluded that the less-stringent *Watson* standard applies to a failure to instruct on self-defense, not the harmless beyond a reasonable doubt standard under *Chapman*. (*People v. Villanueva* (2008) 169 Cal.App.4th 41, 52–53; *People v. Elize* (1999) 71 Cal.App.4th 605, 616.) Under *Watson*, we reverse only when it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*Watson*, at p. 836.)

In the present case, Mejia argues that he was prejudiced under *Watson* and *Chapman*, without specifically addressing which standard applies. The Attorney General argues for the *Watson* test. We agree that the *Watson* standard applies to the assessment of prejudice regarding Mejia's claim of instructional error. (See *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219 (*Watt*) [collecting cases noting that *Watson* applies to failure to instruct on a lesser included offense, mistake of fact, and self-defense]; see also *People v. Beltran* (2013) 56 Cal.4th 935, 955 [" ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*.' "].)

---

burden of proving beyond a reasonable doubt that the defendant used more force than was reasonable to protect property from imminent harm. If the People have not met this burden, you must find the defendant not guilty of [] *<insert crime>*."

"In applying the *Watson* standard, we may look to the other instructions given, as well as whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability that the error affected the result." (*Watt*, *supra*, 229 Cal.App.4th at p. 1220.) "We also consider . . . the jury's findings[] and the closing arguments of counsel." (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831 (*Larsen*).)

To demonstrate that defense counsel was constitutionally ineffective, a defendant must establish both that counsel's performance was deficient and that prejudice resulted from counsel's error. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) As to the first element of *Strickland*, the defendant bears the burden of demonstrating by a preponderance of the evidence that counsel's performance fell below an objective standard of reasonableness. (*In re Thomas* (2006) 37 Cal.4th 1249, 1257.) To satisfy the prejudice element, the defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome." (*In re Ross* (1995) 10 Cal.4th 184, 201.)

### 3. Analysis

Mejia contends that defense of property is an affirmative defense to a violation of section 273.5 and, because there was substantial evidence supporting this consistent defense, the trial court was required to instruct the jury on it. The Attorney General does not challenge Mejia's contention. In light of the Attorney General's decision not to contest Mejia's claim the trial court erred by failing to instruct sua sponte on the defense of property, we will assume arguendo that the trial court erred when it neglected to instruct the jury on that defense for count 2.

Turning to the issue of prejudice under *Watson*, Mejia contends: "Had the court instructed on defense of property, the jury would likely have found [Mejia] not liable for injury to [Sophia]'s wrist, based on the favorable testimony regarding [Mejia]'s keys."

21

Mejia asserts that the jurors "appeared to find the controversy regarding [Mejia]'s wallet significant," because they requested a readback of Mejia's testimony about his retrieval of the wallet. Further, Mejia notes that the prosecutor did not challenge his testimony about recovering his keys from Sophia in the hallway outside the apartment. In addition, Mejia maintains the jury "evidenced skepticism of [Sophia]'s testimony regarding the fight in the apartment." The purported skepticism is grounded in their acquittal on count 1—in the face of prosecution evidence that Mejia choked Sophia—and the not-true finding for great bodily injury on count 2—in the face of prosecution evidence that Mejia punched Sophia's nose and kicked her face, causing a broken nose. Mejia maintains: "[B]ecause the jury found [Sophia]'s account of the fight in the apartment unconvincing, it likely found that the prosecution had failed to prove absence of self-defense as to the swelling on [Sophia]'s neck and jawline," and "[t]he conviction for assault (the lesser-included offense to count 1), therefore, likely indicated the jury's finding that [Mejia] had applied excessive force to [Sophia]'s neck and jawline to defend himself."

We agree with Mejia that the most reasonable inference from the verdicts—in light of the jury instructions and counsels' arguments—is that the jury concluded that the prosecution did not prove beyond a reasonable doubt that Mejia choked Sophia or broke her nose. The prejudice inquiry, therefore, focuses on whether a defense of property instruction would likely have affected the jurors' assessment of Mejia's criminal responsibility for Sophia's other injuries.

In his argument that prejudicial error occurred, Mejia focuses on the evidence about the injury to Sophia's wrist. However, having reviewed the record, we believe it is unlikely that the jury based its verdict for count 2 on that injury. Sophia did not testify that Mejia grabbed or injured her wrist in the hallway. She testified only that Mejia followed her out of the apartment, grabbed her by her hair, pulled her, and punched her in the head in the hallway. In addition, the prosecutor did not highlight the wrist bruising when arguing for Mejia's guilt on count 2. Rather, the prosecutor maintained that count

22

2 "come[s] down to" what the jurors "believe happened in that apartment" and mentioned specifically "hits," "kick," "hair pulling," "bruises to her neck," "scrapes," "swelling," and, for the great bodily injury allegation, "breaking her nose." While we acknowledge that the prosecutor also told the jury that count 2 "is for everything that happened that is not choking," " '[t]he question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed.' " (*Larsen*, *supra*, 205 Cal.App.4th at p. 831.) There was ample evidence demonstrating that Mejia inflicted corporal injury in violation of section 273.5, irrespective of the wrist bruising.

The testimony provided by Sophia and Officer Wellman, in conjunction with the photographs and medical records, substantiated that Mejia punched and kicked Sophia in the face and caused bruises to her jaw and neck, black eyes, and a bloody nose and mouth. Officer Wellman also observed "some fresh wounds" on Mejia's right knuckles, providing corroboration for Sophia's account that Mejia had punched her. In addition, Mejia had previously been convicted of domestic violence, which the jury was permitted to use to conclude Mejia had a propensity to commit such violence and had committed the crime charged in count 2. In our judgment, the totality of the evidence provided significant support for Mejia's conviction on count 2 and does not suggest that the conviction was based on any injury to Sophia's wrist.

Nevertheless, even if the jury may have considered the wrist bruising when deciding whether to convict Mejia on count 2, that does not compel us to conclude that Mejia, in fact, was prejudiced by the lack of instruction on defense of property. If the trial court had instructed the jurors with CALCRIM No. 3476, it is likely the jurors would have found that the prosecution proved, beyond a reasonable doubt, that Mejia "used more force than was reasonable to protect property from imminent harm." (CALCRIM No. 3476.) Even assuming arguendo that Sophia's act of grabbing Mejia's keys from the kitchen counter and leaving the apartment with them would reasonably cause a person to

23

believe that the keys and car needed to be protected from imminent harm, it is not likely in this case that Mejia would have been acquitted for defending his property.

To acquit Mejia based on that defense, the jurors would have had to focus on the keys and wrist bruising, accept Mejia's explanation for the wrist bruising, conclude that reasonable force had caused the wrist bruising, and reject the other evidence concerning Sophia's traumatic injuries or find that Mejia acted in self-defense with respect to those injuries. The jury's rejection of Mejia's self-defense theory for count 2 (for which they did receive an instruction) provides a strong indication that the jurors believed Mejia "used more force than was reasonable" during the incident. (See CALCRIM No. 3470.) In our judgment, it is not reasonably likely that the jury (as Mejia suggests) "convicted [him] on count 2 for inflicting a traumatic injury to [Sophia]'s wrist, despite having accepted [his] self-defense claim regarding [Sophia]'s facial injuries." Rather, we conclude it is not reasonably probable Mejia's jury would have acquitted him of count 2 or returned a lesser verdict even if it had it been instructed on the defense of property.

For the same reasons, we are not persuaded that Mejia has demonstrated prejudice for his claim of ineffective assistance of counsel. As a threshold matter, we note that forfeiture of Mejia's claim of instructional error is not at issue because we have assumed the trial court had a sua sponte duty to instruct on defense of property. Nevertheless, for the reasons discussed above, we conclude that, had the jury been instructed on the defense of property upon defense counsel's request, there is no reasonable probability that the result on count 2 would have been more favorable to Mejia.

In sum, we reject Mejia's claims concerning instructional error on the defense of property.

B. *Unanimity Instruction*

Mejia contends the trial court erred by failing to instruct the jury sua sponte on unanimity for count 2. Alternatively, Mejia asserts that, if this court concludes he forfeited his argument concerning the lack of such an instruction, his defense counsel

24

performed ineffectively by failing to request the instruction. The Attorney General responds that the trial court was not required to instruct on unanimity here because the continuous-course-of-conduct exception applies. The Attorney General further asserts that, even if the jury should have been instructed regarding unanimity, the trial court's failure to do so was harmless error under *Chapman*. Finally, the Attorney General maintains Mejia has failed to demonstrate that his defense counsel was prejudicially ineffective for failing to request a unanimity instruction for count 2.

### 1. Additional Background[13]

Pretrial, the prosecutor submitted a list of proposed jury instructions that included a unanimity instruction. When the trial court and parties discussed the proposed jury instructions during trial, they reviewed a unanimity instruction based on CALCRIM No. 3502 ("Unanimity: When Prosecution Elects One Act Among Many"). During the discussion, the prosecutor noted his election regarding acts of choking for count 1 and said the jurors "can't find another way for it to have been done." Defense counsel responded, "And you don't have Count Two in [the instruction]." The court responded, "We don't need it for Count Two. That's a continuous course of conduct."

The trial court ultimately instructed the jury on unanimity for counts 1, 3, and 4, but not count 2.

After trial, Mejia—through his newly appointed counsel—filed a motion for new trial. In the motion, Mejia argued that the trial court should have instructed the jury on unanimity as to count 2, because the continuous-course-of-conduct exception to the unanimity rule did not apply under the facts of this case. Mejia asserted that "he offered different defenses for the acts that were described to the jury" and the "acts in this case were discrete and the jury could have distinguished them." More specifically,

---

[13] The background information discussed in section II.A.1., *ante*, is also relevant to Mejia's claims regarding the lack of a unanimity instruction. We rely on this background information as necessary when considering Mejia's unanimity claims.

Mejiaclaimed that he "testified regarding the injuries the alleged victim suffered and explained that he caused them in self-defense. All except the injury to her wrist. He conceded that he grabbed her wrist, but not in self-defense." The prosecutor opposed Mejia's motion.

The trial court held a hearing on Mejia's new trial motion and denied it. The trial court stated, inter alia: "The prosecution made clear that the choking act was as to Count One. [Mejia] now asserts he caused a number of injuries to [Sophia], but all of them were in self-defense except the injury to her wrist. But [Mejia] did not offer a different defense to the wrist injury. In fact, [Mejia] testified that [Sophia] was leaving with his keys and took a swipe at him and tried to run around him, so [Mejia] grabbed her wrist. No unanimity instruction was required."

2. Legal Principles

The state and federal constitutions require unanimous verdicts. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*); *Ramos v. Louisiana* (2020) ___ U.S. ___ [140 S.Ct. 1390, 1397].) "As a general rule, when violation of a criminal statute is charged and the evidence establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied for the allegation of the information, or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*).) "This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' " (*Russo*, at p. 1132.) "On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*Ibid*.)

26

Thus, there are several exceptions to the general rule. "For example, no unanimity instruction is required if the case falls within the continuous-course-of-conduct exception, which arises 'when the acts are so closely connected in time as to form part of one transaction' [citation], or 'when the statute contemplates a continuous course of conduct or a series of acts over a period of time.' [Citation.] There also is no need for a unanimity instruction if the defendant offers the same defense or defenses to the various acts constituting the charged crime." (*Jennings*, *supra*, 50 Cal.4th at p. 679.)

Defense counsel's failure to request a unanimity instruction does not forfeit the issue on appeal. (*People v. Carrera* (1989) 49 Cal.3d 291, 311, fn. 8 (*Carrera*).) "Even absent a request, the court should give the instruction 'where the circumstances of the case so dictate.' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1199.) Appellate courts review de novo whether the trial court erred in failing to give a unanimity instruction. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

3. <u>Analysis</u>

Mejia asserts that, because the prosecutor argued the jury could rely on "everything that happened that is not choking" (which would include the wrist bruising) for count 2, "this court should find that the prosecutor made no *effective* election between conduct in the apartment and conduct in the apartment hallway, and thus, the court had a duty to instruct sua sponte on unanimity as to count 2." Mejia further maintains that he testified to "an act separated in time from the acts in the apartment at issue, and tendered different defenses regarding the act in the hallway and the acts in the apartment, and the jury had a reasonable basis to distinguish between the acts."

We are not persuaded the trial court here had a duty to instruct on unanimity for count 2. Initially, Mejia and the Attorney General state conflicting positions regarding whether, for the purposes of unanimity, section 273.5 itself contemplates a continuous course of conduct or a series of acts over a period of time.

Mejia urges us to decide this question by relying on a decision of another panel of this court in *People v. Johnson* (2007) 150 Cal.App.4th 1467, as well as *People v. Lueth* (2012) 206 Cal.App.4th 189, 192 (*Lueth*). In *Johnson*, the panel concluded that a defendant may be charged or convicted of multiple counts under section 273.5, "where multiple applications of physical force result in separate injuries" to the victim during a single incident. (*Johnson*, at p. 1477.) *Johnson*, however, did not address any question regarding the need for a unanimity instruction. In *Lueth*, the Court of Appeal observed that "the case law does not clearly or consistently define the unit of prosecution under Penal Code section 273.5" for inflicting corporal injury on a partner. (*Lueth*, at p. 192.)

By contrast, the Attorney General relies on *People v. Thompson* (1984) 160 Cal.App.3d 220 to argue that section 273.5 contemplates a continuous course of conduct. In *Thompson*, the Court of Appeal concluded that section 273.5 is an offense of continuous conduct for purposes of a unanimity instruction.[14] (*Id*. at pp. 224–226.)

In the present case, we need not decide whether section 273.5 is generally a crime of continuous conduct for purposes of a unanimity instruction, because the continuous-course-of-conduct exception may also arise when the specific facts demonstrate that " ' "the acts alleged are so closely connected as to form part of one transaction." ' " (*People v. Williams* (2013) 56 Cal.4th 630, 682 (*Williams*).) "Specifically, '[t]he "continuous conduct" rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them.' " (*Ibid*.) " 'This exception " 'is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." ' " ' " (*Lueth*, *supra*, 206 Cal.App.4th at p. 196.)

---

[14] The court in *Lueth* did "not decide whether *Thompson* or *Johnson* is correct," because the outcome in *Lueth* was an affirmance regardless of the differing conclusions in those cases. (*Lueth*, *supra*, 206 Cal.App.4th at p. 192.)

Here, the prosecution's evidence established that Mejia attacked Sophia over a brief period.[15] The prosecutor framed the issue of Mejia's guilt on count 2 as "com[ing] down to Sophia versus a felon" and what the jurors "believe[d] happened in that apartment." The prosecutor also referenced generally "everything that happened that is not choking" and articulated specific acts and injuries, not including the wrist grabbing/bruising elicited by the defense. Accordingly, the prosecution evidence and argument presented the crime as an incident that occurred continuously over a short period of time in a limited space and, as such, formed part of one transaction.

Further, at trial, Mejia offered " 'essentially the same defense to each of the acts.' " (*Williams*, *supra*, 56 Cal.4th at p. 682.) Mejia testified that Sophia repeatedly attacked him inside the apartment and did so again in the hallway. Mejia denied punching or kicking Sophia. He claimed that he defended himself from Sophia's attacks and tried to restrain her, thereby causing her bruises. Mejia also said he asked Sophia several times to give him his keys and wallet while still inside the apartment, and he tried to grab his wallet from Sophia before it flew out of her hand. According to Mejia, when he ran into the hallway after Sophia, he "continue[d] to tell her, hey, give me my keys." When he caught up to her, he again asked for his keys. Sophia then "t[ook] another swipe" at him and tried to run around him. Mejia then grabbed her wrist and again said "give me my keys."

Under these facts (as testified to by Mejia himself), Mejia's attempt to regain possession of his keys and his grabbing of Sophia's wrist in the hallway were not discrete circumstances. Rather, those actions were part of an ongoing effort begun inside the apartment to get back his keys after Sophia had grabbed them and his wallet from the kitchen counter. Mejia's actions in the hallway after Sophia took "another swipe" at him

---

[15] Mejia, too, testified that Sophia's attack on him was "very brief, less than a minute."

fit within his continuing self-defense narrative and was not portrayed as behavior that was distinct from the rest of the altercation.

Moreover, like the prosecutor, Mejia's defense counsel argued that the jury's decision should turn on whom they believed, Sophia or Mejia. In addition, when arguing for self-defense, defense counsel contrasted Mejia's "credible details of an argument and assaultive behavior, by which he reasonably defends" against Sophia's "story of six to seven, seven to eight facial head punches, kicks, and separate acts of strangulation, and all the blood that she says, while Officer Wellman doesn't see any." Counsel asserted, "If this were true, the results would have been different, would have been much worse." Through these arguments, defense counsel urged the jury to accept Mejia's defense for the entire incident and reject Sophia's version of events.

Having reviewed Sophia's and Mejia's testimony and the closing arguments of the parties, we conclude that Mejia offered essentially the same defense to all the acts and blamed Sophia's own "assaultive behavior" for all her injuries. Under these circumstances, the continuous-course-of-conduct exception applies, and the trial court was not required to instruct the jury on unanimity for count 2. (See *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1534.)

Regarding ineffective assistance of counsel, Mejia argues that, "[i]n the event this court finds that counsel forfeited [Mejia]'s argument regarding the absence of instruction on unanimity as to count 2," his defense performed ineffectively by failing to request that instruction. As explained above, defense counsel's failure to request a unanimity instruction does not forfeit an issue regarding whether the trial court should have given that instruction sua sponte. (*Carrera*, *supra*, 49 Cal.3d at p. 311, fn. 8.) Thus, we have not applied the doctrine of forfeiture to Mejia's claim of instructional error. Hence, we have no reason in this appeal to examine whether defense counsel's failure to request a unanimity instruction fell below an objective standard of reasonableness. Accordingly, we will not consider Mejia's alternative claim of ineffective assistance of counsel.

30

For these reasons, we conclude the trial court was not required to provide the jury a unanimity instruction for count 2. Accordingly, we reject Mejia's claims of instructional error.

C. *Cumulative Error*

Mejia contends that the cumulative effect of the errors he asserts concerning the trial court's failure to instruct sua sponte on the defense of property and unanimity amounts to reversible and prejudicial error.

" 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1217.) Here, we assumed arguendo that the trial court erred when it failed to instruct the jury on the defense of property for count 2. We determined, however, that the error was not prejudicial. In addition, we found no error in the trial court's failure to instruct on unanimity for count 2. Having assumed one instructional error and found no error on the other instructional claim, we do not have multiple errors to cumulate. Accordingly, we reject Mejia's claim of cumulative error.

D. *Double Jeopardy as to Counts 1 and 2*

Mejia claims that the federal and state constitutional protections against double jeopardy "require dismissal of count 1 because the same act proved the assault in count 1 and the infliction of corporal injury offense in count 2." More specifically, Mejia argues that, if this court agrees with the assertion made in the prosecutor's opposition to the new trial motion that " 'the People never argued that the grabbing of a wrist would suffice for [count 2],' " then we should dismiss count 1, as a lesser included offense of count 2. Mejia reasons that, for count 1, the jurors convicted him of simple assault based on his "gripping of [Sophia]'s neck (but not choking her unconscious)," which in turn bruised Sophia's neck. Mejia asserts further that this act also proved infliction of corporal injury for count 2 given that the prosecutor argued count 2 encompassed "the bruises to [Sophia's] neck."

31

The Attorney General responds that Mejia forfeited his double jeopardy claim by failing to raise it in the trial court. In addition, the Attorney General argues that Mejia's claim lacks merit because double jeopardy protections apply only to successive proceedings (not "one information, one trial, and one prosecution") and, nevertheless, the prosecutor's closing argument distinguished between the choking as the factual basis for count 1 and the other violent acts and resulting injuries as the factual basis for count 2.

Regarding forfeiture, Mejia replies that his current double jeopardy claim is not subject to forfeiture because vacatur of a lesser included offense conviction is required on appeal if he also was convicted of the greater offense.

Regardless whether Mejia may have forfeited his current claim, we are not persuaded that his conviction on count 1 was necessarily based on the same act (i.e., "gripping of [Sophia]'s neck) as that underlying count 2. The evidence and argument did not ascribe any one act as the source of Sophia's neck bruises. Although the jurors may have considered the bruises on Sophia's neck when deciding Mejia's guilt on count 2, that injury was not directly tied to Mejia gripping Sophia's neck (the factual basis for count 1). Rather, in accord with the prosecutor's argument, the "hits" and "kick" could have served as the basis for the neck bruises for count 2, as well as the other traumatic conditions like the swelling, bruises, and abrasions on Sophia's face and eyes. Hence, Mejia's claim falters on its factual premise, and we conclude that the convictions on count 1 and count 2 were not based on the same act.

For these reasons, we reject Mejia's claim that count 1 should be dismissed.

### III. DISPOSITION

The judgment is affirmed.

_____

                             Danner, J.

WE CONCUR:

_____

Elia, Acting P.J.

_____

Grover, J.

**H046662**
*People v. Mejia*